Michael John **WARN**, et al., Plaintiffs,

v.

**M/Y MARIDOME**, et al., Defendants.

No. CIV. 96–1800–B(RBB).

United States District Court,
S.D. California.

March 31, 1997.

1362

Matthew Quint of Wilson & Quint, San Francisco, CA, Frank Brucculeri of Tabrisky, Brucculeri & Stein, Long Beach, CA, for Plaintiffs.

George Koelzer, Robert Zapf, Joshua Force of Lane Powell Spears Luborsky, LLP, Los Angeles, CA, Justs Karlson, S. Mark Varney, Carroll, Burdick & McDonough, LLP, San Francisco, CA, for Defendants.

## ORDER:

1. DENYING DEFENDANT BOOS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION;

2. GRANTING DEFENDANT MARI-DOME MARINE LTD.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION;

3. GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION;

4. DENYING DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AS MOOT;

5. GRANTING DEFENDANTS' MOTION TO DISMISS FOR FORUM NON CONVENIENS.

BREWSTER, District Judge.

This matter came on regularly for hearing on defendants' motions to dismiss for lack of

personal jurisdiction, lack of subject matter jurisdiction, failure to state a claim upon which relief can be granted, and for forum non conveniens. Matthew Quint of Wilson & Quint, and Frank Brucculeri of Tabrisky, Brucculeri & Stein appeared for plaintiffs. George Koelzer, Robert Zapf, and Joshua Force of Lane Powell Spears Lubersky LLP appeared for defendants James Boos and Maridome Marine Ltd. Justs Karlson and S. Mark Varney of Carroll, Burdick & McDonough LLP appeared for defendant Boston Whaler Co. After careful consideration of the moving and opposing papers and the oral arguments of counsel, the Court DENIES Boos's motion to dismiss for lack of personal jurisdiction, GRANTS Maridome Marine Ltd's motion to dismiss for lack of personal jurisdiction, GRANTS defendants' motion to dismiss for lack of subject matter jurisdiction, DENIES defendants' motion to dismiss for failure to state a claim upon which relief can be granted, and GRANTS defendants' motion to dismiss for forum non conveniens.

## I. Case Type and Jurisdiction

In an accident off the coast of Greece, several crewmembers and guests of the M/Y Maridome were killed or seriously injured when its tender collided with a steel structure in the harbor of Port of Poros. Plaintiffs have filed suit against the vessel, in rem, against its captain and owner, in personam, and against the manufacturer of the tender, in personam. Plaintiffs allege causes of action based on the Death on the High Seas Act (DOHSA), 46 U.S.C.App. § 741 *et seq.*, the Jones Act, 42 U.S.C.App. § 688 *et seq.*, and General Maritime Law.

## II. Background

### A. The M/Y Maridome

The M/Y Maridome ("Maridome") is a 177 foot luxury yacht owned by Maridome Marine Limited ("MML"), a Channel Islands (U.K.) company. The Maridome is of British Registry and flies the British flag. MML has only issued two shares of stock which are held by nominees for the benefit of Enrique Molina. Molina is the C.E.O. of GEMEX, the largest bottler for Pepsi outside of the United States. Molina lives and does business in Mexico. The ship travels around the world.

The Captain of the Maridome is James Boos ("Boos"), an American citizen who has not lived in the United States in the past twenty years.

MML's board of directors are all British citizens. Plaintiffs contend that these directors have no responsibility for the management or operation of the Maridome. MML was incorporated in the Channel Islands because they are a tax haven. The attorneys who incorporated MML also serve as its nominal board of directors.

### B. Summary of the Accident

On September 3, 1995, the Maridome was anchored off the coast of Port of Poros, Greece. Several crew members were on shore for the evening. In the early morning hours, they radioed the ship and First Engineer Ian MacNeil drove the ship's tender, a 21 foot customized Boston Whaler, to shore. He picked up a large number of passengers and began driving across the harbor. Plaintiffs contend that MacNeil was intoxicated, was traveling at an excessive rate of speed, and that the tender was seriously overloaded. While traveling across the harbor at approximately 25 knots, the tender struck a metal structure lying in shallow water. Passengers Nicholas Warn, George Stathopoulos, Andreas Brigman, and Simon Willshaw were killed in the accident. Richard Brooks was seriously injured.

Warn, Willshaw and Brooks were crewmembers of the Maridome and were citizens of the United Kingdom. They signed employment contracts in Barbados, Gibraltar and St. Martin, respectively. Brigman and Stathopoulos were guests on the tender and were dual citizens of Greece and Germany.

### C. The Instant Action

The estates and family members of the deceased passengers and Richard Brooks have filed suit against the Maridome, MML, James Boos ("Boos"), and Boston Whaler, Inc. ("Whaler"). Plaintiff Brooks asserts causes of action for personal injuries under the Jones Act and maintenance and cure

under General Maritime Law. The estates of the other deceased crewmembers sue for wrongful death under the Jones Act. The crewmembers' families bring survival actions under the Jones Act. The guests on board the tender bring wrongful death actions under the Jones Act, and their family members bring survival actions as well. All plaintiffs sue Boston Whaler for negligence and strict liability in the design and manufacture of the tender.

On October 16, 1996, plaintiffs attached the Maridome in San Diego pursuant to Supplemental Rule B for Certain Admiralty and Maritime Claims while it was being repaired. Captain Boos was onboard the vessel when it was attached, and he was personally served with a copy of the summons and complaint in this case. After posting a $15,000,000 bond, the Maridome was released. It left San Diego shortly thereafter.

Defendants Maridome, MML and Boos have filed a motion to dismiss for lack of personal jurisdiction, lack of subject matter jurisdiction, failure to state a claim upon which relief can be granted, and forum non conveniens. Defendant Whaler filed a motion to dismiss for forum non conveniens.

Since the issues of personal jurisdiction and forum non conveniens are at the heart of this motion, there is a more detailed analysis of the Maridome's contacts with the United States below.

## D. Management of the Maridome

Upon purchasing the Maridome, Molina hired Peter Lee ("Lee"), a resident of Virginia, to captain the ship for him. Lee served as captain from August 1992 until April 1994. Lee's duties as captain included hiring the crew, and managing the ship's accounts, repair work, insurance, and all other aspects of the ship's day to day operations. Lee stepped down as captain in April 1994, but remained the manager of the Maridome until August 1995, just days before the accident. During this time, he managed the Maridome out of his home in Virginia. MML provided Lee with a power of attorney which allowed him to manage all aspects of the Maridome, save selling or mortgaging it.

Much of the management of the Maridome occurred in the United States. In February 1994, Lee formed a Virginia corporation, Marine Management, Inc. ("MMI"), to manage the Maridome and another of Enrique Molina's yachts, the Esterel. Lee was paid $100,000 per year to manage the crew hiring; supervise repair work; handle ship's mail, parts and supplies; and to submit monthly budgets and accounting summaries to Molina. During this 18 month period, Lee worked approximately 30 hours per week performing these duties. He maintained over 3500 pages of records in his home office regarding his management of the Maridome. Defendants contend that Falb, Molina's chief financial advisor, actually makes the business decisions regarding the Maridome.

Lee's duties were slowly diminished during 1995, and were terminated completely only two or three days before the accident in Port of Poros, Greece.

Other specific contacts with the United States are listed below:

1. The Maridome has always used U.S. insurance brokers to procure insurance. The insurance was actually placed, however, with underwriters in London, England.

2. The permanent mailing address for the ship's mail has always been in the United States. Parts and other supplies were also sent to this address to be forwarded to the ship.

3. Molina set up a bank account with NationsBank in Texas into which he deposited money for the operation and management of the Maridome. Lee used the money in this account for all of the expenses of the Maddome. When there were insufficient funds in the account, Lee would advance money from MMI accounts in Virginia and would be reimbursed.

4. Four of the five significant repairs that have been performed on the vessel have taken place in the United States.

5. Satellite communications services are provided for the vessel by Seven Seas Communications in Miami, Florida.

6. Lee purchased supplies for the Maridome from Lewis Marine in Florida.

7. The Boston Whaler tender was purchased by MMI from Lauderdale Marine in Florida. The tender was also installed in Florida.

8. The Maridome has only stopped in California twice in the past two years: once to refuel and once for repairs. It was during this second stop that the ship was arrested. Similarly, Captain Boos's only two contacts with California are these two visits.

## III. Discussion

### A. Personal Jurisdiction

#### 1. In Rem and Quasi in Rem Jurisdiction

■ Defendants MML and Boos move to have the in personam suits against them dismissed for lack of personal jurisdiction. Defendant Maridome is not moving to have the in rem case against it dismissed on jurisdictional grounds. In rem jurisdiction was established when the ship was arrested in this district. The fact that the Court has in rem jurisdiction over the vessel does not mean that the Court has in personam jurisdiction over MML or Captain Boos.

■ The Supplemental Rule B attachment of the Maridome provides the Court with quasi in rem jurisdiction over MML to the extent of the value of the Maridome. *See Stevedoring Services of America v. Ancora Transport,* 941 F.2d 1378, 1381 (9th Cir. 1991), *cert. granted and vacated on other grounds,* 506 U.S. 1043, 113 S.Ct. 955, 122 L.Ed.2d 112 (1993). Maritime attachment pursuant to Rule B has two purposes: (1) "to obtain jurisdiction of the respondent in personam through his property," and (2) "to assure satisfaction of any decree in libelant's favor." *Id.* "Although jurisdiction achieved through maritime attachment is denominated 'in personam,' it is clear that, absent personal service or an appearance by defendant, the judgment had is in the nature of quasi in rem." *Id; see Polar Shipping Ltd. v. Oriental Shipping Corp.,* 680 F.2d 627, 637 (9th Cir.1982) ("Assets of the owner ... within

the jurisdiction today, may be transferred elsewhere or paid off tomorrow. It is for these reasons that ... attachment in actions *in personam,* Supplemental Rule B, [was] developed. These reasons are as valid today as they ever were."). Once someone's property is attached, the Court has jurisdiction over that person for a judgment up to the value of the property seized. This means that the Court has jurisdiction over MML up to the value of the $15,000,000 bond which has been posted, regardless of whether it is denominated in personam, in rem or quasi in rem jurisdiction.

■ Quasi in rem jurisdiction under Supplemental Rule B is only available when the defendant's contacts with the forum are insufficient to maintain normal in personam jurisdiction over the defendant. "With respect to any admiralty or maritime claim in personam a verified complaint may contain a prayer for process to attach the defendant's goods and chattels, ... if the defendant shall not be found within the district." Supplemental Rule B(1); *see State of Oregon v. Tug Go Getter,* 398 F.2d 873, 874 (9th Cir.1968) (finding that defendant had to not be found within the district in order for a Rule B attachment to be proper).

The only effect of MML's challenging personal jurisdiction is that if the Court finds no personal jurisdiction, and a judgment were entered by the Court in excess of the $15,-000,000 bond that has been posted, MML would not be liable for a deficiency judgment.

#### 2. Statutory Authority for the Exercise of Personal Jurisdiction

■ Pursuant to Rule 12(b)(2), a court may dismiss a suit for "lack of jurisdiction over the person." Fed.R.Civ.P. 12(b)(2). The Ninth Circuit has established a two-step test for determining the propriety of asserting personal jurisdiction:

First, the relevant state's long-arm statute must permit jurisdiction. Second, the exercise of jurisdiction must be consistent with the demands of due process.

*Greenspun v. Del E. Webb Corporation,* 634 F.2d 1204, 1207 (9th Cir.1980) (citing *H. Ray Baker v. Associated Banking Corporation,*

592 F.2d 550, 551 (9th Cir.1979), *cert. denied,* 444 U.S. 832, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979)). As to the first inquiry, California Civil Procedure Code § 410.10 provides that "a court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." CAL. CIV. PROC. CODE § 410.10 (Deering 1991). Thus, the "statutory limitations upon jurisdiction are 'coextensive with the outer limits of due process under the state and federal constitutions, as those limits have been defined by the United States Supreme Court.'" *Data Disc, Inc. v. Systems Technology Associates, Inc.,* 557 F.2d 1280, 1286 (9th Cir.1977) (citing *Republic International Corporation v. Amco Engineers, Inc.,* 516 F.2d 161, 167 (9th Cir.1975)).

### 3. Due Process Concerns

■■■ A defendant must have certain "minimum contacts" with the forum so that the Court's exercise of jurisdiction does not "offend traditional notions of fair play and substantial justice." *Data Disc, Inc.,* 557 F.2d at 1287 (citing *International Shoe Company v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)).

> The Supreme Court has bifurcated this due process determination into two inquiries, first, that the defendant have the requisite contacts with the forum state to render it subject to the forum's jurisdiction, and second, that the assertion of jurisdiction be reasonable.

*Amoco Egypt Oil Co. v. Leonis Navigation Co., Inc.,* 1 F.3d 848, 851(9th Cir.1993). When a defendant moves to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), the plaintiff has the burden of making "a prima facie showing of jurisdictional facts." *Data Disc,* 557 F.2d at 1285–86. The required prima facie showing must be of either general or specific jurisdiction.

### a) General Jurisdiction

■■■ General jurisdiction exists where a non-resident defendant's activities in the state are "substantial" or "continuous and systematic." *Data Disc, Inc.,* 557 F.2d at 1287; *Omeluk v. Langsten Slip & Batbyggeri A/S,* 52 F.3d 267, 270 (9th Cir.1995). It is clear that MML and Boos have no regular,

continuous or systematic contacts with California. The vessel and Boos have only been to California twice in the past two years; once for fuel and once for repairs. MML is a British corporation, none of its shareholders or board members are U.S. citizens, and the Maridome flies the British flag. MML does not maintain an office nor conduct any business in California other than occasional repair work.

■■■ Plaintiffs respond that Fed. R.Civ.P. 4(k)(2) provides the Court with general jurisdiction over MML and Boos.

> If the exercise of jurisdiction is consistent with the Constitution and the laws of the United States, serving a summons ... is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to jurisdiction of the courts of general jurisdiction of any state.

Fed.R.Civ.P. 4(k)(2). This rule allows a federal court to consider a defendant's nationwide contacts

> when the defendant was a non-resident of the United States having contacts with the United States sufficient to justify the application of United States law ... but having insufficient contact with any single state to support jurisdiction under state long-arm legislation or meet the requirements of the Fourteenth Amendment limitation on state court territorial jurisdiction.

Fed.R.Civ.P. 4, Advisory Comm. Notes. The defendants point out that this

> narrow extension of federal reach applies only if a claim is made against the defendant under federal law. It does not establish personal jurisdiction if the only claims are those arising under state law or the law of another country.

*Id.*

Rule 4(k)(2) thus sanctions personal jurisdiction over foreign defendants for claims arising under federal law when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' law but without sufficient contacts to satisfy the due process con-

cerns of the long-arm statute of any particular state.

*World Tanker Carriers Corp. v. M/V Ya Mawlaya,* 99 F.3d 717, 720 (5th Cir.1996); *see Western Equities, Ltd. v. Hanseatic, Ltd.,* 956 F.Supp. 1232 (D.V.I. 1997). A precondition to the application of this rule is that the defendant cannot be subject to the long-arm jurisdiction of any state. *AT & T v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 590 (9th Cir.1996), *supplemented,* 95 F.3d 1156 (9th Cir.1996).

Plaintiffs assert federal causes of action based on the Jones Act, DOHSA and General Maritime Law. Courts have consistently held that Rule 4(k)(2) applies to admiralty actions because they "arise under federal law." *World Tanker,* 99 F.3d at 720–23; *Western Equities,* 956 F.Supp. at 1234–36; *United Trading Company v. M/V Sakura Reefer,* 1996 WL 374154 at *34 (S.D.N.Y. July 2, 1996).

Defendants argue that they do not have national contacts which are sufficiently substantial and continuous to support the exercise of personal jurisdiction pursuant to Rule 4(k)(2). Plaintiffs detail the actions of Peter Lee in the United States and contend that his contacts with the United States are systematic and continuous enough to justify exerting general jurisdiction over MML and Captain Boos. MML is the corporation that legally owns the Maridome. It hired Lee and provided him with a power of attorney empowering him to manage and operate the ship in all respects save mortgaging or selling it. The agreement gave Lee the authority:

> To manage the said yacht and to sail it to any place at his discretion ... To accept on the Company's behalf service of any order, writ, summons or other legal process ... To retain, employ and pay cruise staff, advocates, solicitors, accountants, brokers and other agents ... To pay wages, salaries ... and any other disbursements as may be contracted ... To

bind by his signature the Company in connection with said yacht toward any person, company or state authority ... save with regard to the sale or mortgage of said yacht.... To open and operate any accounts, deposits therein and withdraw therefrom any monies....

This agreement made Lee an agent of MML, and for this reason, Lee's contacts are attributable to his principal, MML.[1] This power of attorney was revoked two days prior to the accident off the coast of Greece.

Lee's activities in the United States included hiring crewmembers, managing the finances of the Maridome, arranging for and overseeing repairs on the vessel, ordering supplies and other provisions needed for the vessel, paying the ship's expenses through an account in Texas, arranging for satellite services through a Florida corporation, maintaining a permanent address for the Maridome in Florida, purchasing and installing the Boston Whaler tender in Florida, and preparing and submitting monthly budget and accounting summaries to Molina's accountants. Although MML is a foreign corporation whose shareholders are foreign citizens, its agent conducted business in the United States. In fact, MML's agent managed the day to day operations of the corporation's largest asset, the Maridome, from an office in the United States.[2]

In *Western Equities v. Hanseatic,* the court faced a similar situation. A tender on one luxury yacht collided several times with another large luxury yacht off the coast of the West Indies. 956 F.Supp. at 1234. Both of the companies which owned the yachts were incorporated in the Channel Islands (U.K.) and flew the British flag. The owner of the yacht that had been damaged sued the owner of the other yacht in the District Court for the Virgin Islands. *Id.* at 1234–35. Plaintiff attempted to assert personal jurisdiction over defendant based on its national contacts under Rule 4(k)(2). Defendant's

---

1. Lee did not have a written contract of employment with MML. He drafted one and sent it to Molina in Mexico, but it was never signed. Molina and Lee did, however, have an oral understanding that Lee would manage the Maridome for $100,000 per year.

2. MML terminated Lee's agency, and all management activities within the United States ceased two days prior to the accident.

contacts consisted of: (1) several visits to U.S. ports by the vessel, (2) an attempt by defendant to sell the vessel through a U.S. broker, (3) advertising for charter business in U.S. periodicals, and (4) soliciting U.S. yacht brokers for charter business. *Id.* at 1235–37. The court concluded that these contacts were not sufficiently substantial or continuous to support the exercise of personal jurisdiction over defendant. *Id.* 1239. The court noted that a defendant needs to transact business in the United States, not merely have sporadic contacts with the U.S., in order for U.S. courts to have personal jurisdiction over defendant. *Id.* at 1237–38. In determining whether a defendant has transacted business in the U.S., "a court must determine whether the defendant has engaged in purposeful activity in the United States, thus invoking the benefits and protection of United States' law." *Id.* at 1237.

Similarly, in *United Trading Company,* the court held that one visit to a port in Philadelphia and maintenance of a bank account in the United States were insufficient national contacts to support personal jurisdiction under Rule 4(k)(2) over the company that owned the vessel. 1996 WL 374154 at *5. The Court noted that defendant must transact business in the United States such that it has engaged in purposeful activity within the United States. *Id.*

In *Pacific Employers Insurance Co. v. M/T Iver Champion,* 1995 WL 295293 (E.D.La. May 11, 1995), a load of fish oil was damaged during shipment and suit was filed against the insurer of the vessel. The insurer moved to dismiss for lack of personal jurisdiction. Applying Rule 4(k)(2), the court concluded that it had jurisdiction over defendant insurance company based on the following contacts: (1) a number of insureds resided in the U.S., (2) it maintained an agent for service of process in New York, (3) it hired a firm in New York to assist it with defending personal injury and cargo claims, repatriating seamen, and providing medical attention to injured crewmen, (4) it maintained two bank accounts in the U.S. from which it

disbursed funds to its agents in the U.S., and (5) representatives of defendant visited the U.S. on a regular basis to meet with insureds and insurance brokers. *Id.* at *5–6. These activities constitute "transacting business in the United States."

In the instant case, MML's agent managed the vessel within the U.S., purchasing supplies and services for the vessel, arranging for and overseeing repairs, performing budgeting and accounting work, hiring crewmembers, and various other activities. This constitutes the transaction of business in the United States. MML has purposefully availed itself of goods and services sold by U.S. companies, services offered by U.S. banks, and the services of a U.S. citizen as manager of its vessel. In fact, Lee incorporated a business entitled Marine Management, Inc. to transact business in the U.S. in order to effectively manage the Maridome. It was at Molina's request that Lee formed this corporation. This clearly invokes the protections and benefits of U.S. laws.

 These contacts are sufficiently substantial and continuous to support the exercise of personal jurisdiction over MML under Rule 4(k)(2), however, MML's transaction of business in Virginia would have subjected it to Virginia's long-arm jurisdiction. Lee was an agent of MML and was authorized to receive service of process on behalf of MML. Thus, the company would have been subject to suit in Virginia by serving Lee.[3] Moreover, Lee's management activities in Virginia were sufficiently substantial and continuous to subject MML to personal jurisdiction in Virginia. If MML is subject to Virginia's long-arm statute, the Court cannot use Rule 4(k)(2) to exert jurisdiction over MML based on its national contacts. *See AT & T v. Compagnie Bruxelles Lambert,* 94 F.3d at 590. For this reason, Rule 4(k)(2) does not apply and the Court must examine MML's contacts with California. These contacts are not sufficiently substantial or continuous so as to support the Court's exercising general jurisdiction over MML.

---

3. This power of attorney was revoked several days prior to the accident that gives rise to this lawsuit, so Lee could not have been served in

Virginia with a summons and complaint in this lawsuit.

### b) Specific Jurisdiction

■ The Ninth Circuit has articulated a three-prong analysis to determine whether a court may exercise specific jurisdiction:

(1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of conducting activities in the forum, thereby invoking the benefits and protections of its laws.

(2) The claim must be one which arises out of or results from the defendant's forum-related activities.

(3) Exercise of jurisdiction must be reasonable.

*Data Disc, Inc.*, 557 F.2d at 1287. In short, whether specific jurisdiction exists "turns on an evaluation of the nature and quality of the defendant's contacts in relation to the cause of action." *Id.*

■ The Court lacks specific jurisdiction over MML because its only two contacts with California are unrelated to the accident which took place off the coast of Greece. For this reason, MML's motion to dismiss for lack of personal jurisdiction is GRANTED.

■ There is specific jurisdiction over Captain Boos because he was personally served with a copy of the summons and complaint in this case while in the Southern District of California. "If a person is served within the territory of the sovereign represented by the issuing court, there is no question that maintenance of the suit against him will not offend traditional notions of fairness." *International Shoe v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). For this reason, Boos's motion to dismiss for lack of personal jurisdiction is DENIED.

### B. Subject Matter Jurisdiction[4]

■ A district court lacks subject matter jurisdiction over a Jones Act suit when the shipowner does not have substantial contacts with the United States so as to be subject to statutory liability in a United States court. *Rodriguez v. Flota Mercante Grancolombiana, S.A.*, 703 F.2d 1069, 1072 (9th Cir.), *cert. denied*, 464 U.S. 820, 104 S.Ct. 84, 78 L.Ed.2d 94 (1983). "Upon a proper showing, a district court may dismiss a complaint for lack of subject matter jurisdiction if the shipowner is not an 'employer' for Jones Act purposes." *Id.* (citing *Hellenic Lines v. Rhoditis*, 398 U.S. 306, 308–09, 90 S.Ct. 1731, 1733–34, 26 L.Ed.2d 252 (1970)). When the shipowner brings a motion to dismiss for lack of subject matter jurisdiction, "the plaintiff must show that the shipowner has substantial contacts with the United States so as to be considered an employer subject to statutory liability in an American court." *Id.*

The Supreme Court in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), listed eight factors which must be considered in deciding whether a shipowner has sufficient contacts with the United States to be an employer within the meaning of the Jones Act: (1) place of the wrongful act, (2) law of the vessel's flag, (3) allegiance or domicile of injured party, (4) allegiance of shipowner, (5) place of the contract, (6) inaccessibility of foreign forum, (7) law of the forum, and (8) base of operations of the shipowner. *Id;* *see Hellenic Lines v. Rhoditis*, 398 U.S. 306, 308, 90 S.Ct. 1731, 1733–34, 26 L.Ed.2d 252 (1970).[5]

■ In this case, all but one of the factors weigh in favor of applying law other than U.S. law. First, the accident took place in Greek territorial waters. Second, the vessel is of British registry and flies the British flag. Third, the injured parties are all Brit-

---

4. Defendants entitle this a motion to dismiss for lack of subject matter jurisdiction and to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6). The Court finds that this motion is properly a motion to dismiss for lack of subject matter jurisdiction. *See Rodriguez v. Flota Mercante Grancolombiana S.A.*, 703 F.2d 1069, 1072 (9th Cir.), *cert. denied*, 464 U.S. 820, 104 S.Ct. 84, 78 L.Ed.2d 94 (1983).

5. Although this analysis determines whether the Court has subject matter jurisdiction over this lawsuit, it is really a choice of law issue. Plaintiffs want United States law, specifically the Jones Act, DOHSA and General Maritime Law, to apply, and defendants want Greek or British law to apply.

ish or Greek/German citizens. Fourth, the shipowner is a British corporation which is owned by a Mexican citizen and resident. Fifth, the contracts of employment of the injured seamen were entered into in Barbados, Gibraltar, and St. Martin. Sixth, suits have already been filed in Greece, so it is not an inconvenient forum. Further, all of the plaintiffs are from European countries, so the U.S. forum would not appear to be the most convenient. Seventh, the law of the forum is U.S. law. Finally, the shipowner's base of operations is either the United States where Lee managed the vessel, on board the vessel with Captain Boos, or Mexico where Molina and Falb reside. Even if the ship were managed in the U.S., this alone is insufficient to require the application of U.S. law. The vessel travels the world, only occasionally stopping in the United States.

Plaintiffs point out that in *Rhoditis,* the Jones Act was applied to a suit brought by a Greek seamen who was injured on a Greek flag ship and whose employment contract provided for the application of Greek law in a Greek forum. *Rhoditis,* 398 U.S. at 307–08, 90 S.Ct. at 1733–34. Plaintiffs fail to point out, however, that the injury took place in U.S. waters off New Orleans, the company that owned the ship had its base of operations in New York, its largest shareholder

was a legal permanent resident residing in Connecticut, and that this ship "and many of its sister ships were earning income from cargo originating or terminating here." *Id.* at 307–310, 90 S.Ct. at 1733–35. The only arguable contacts the Maridome or MML have with the U.S. is that the ship was managed from Virginia, and that Captain Boos is a U.S. citizen. These fact do not mean that U.S. law should apply to an accident in Greek territorial waters, involving Greek and British sailors and a British flagged ship. Even if the Court looks past MML's ownership of the Maridome to Enrique Molina, he is a Mexican citizen who lives in Mexico city. Lee stated that every time he met Molina it was either in Mexico City or on the yacht.

██ Plaintiffs argue that the location of MML's base of operations is the dispositive factor in the *Lauritzen/Rhoditis* analysis. While it is true that this is one of the most important factors to consider, it alone is not dispositive, especially when all other factors weigh against the application of United States law. The Ninth Circuit has consistently weighed all eight of these factors, according the most weight to the law of the flag, the shipowner's base of operations, and the citizenship of the injured seamen.[6] The

---

6. Plaintiffs are correct that courts in the Second and Fifth Circuits have given greater weight to the shipowner's base of operations. In *Antypas v. Cia. Maritima San Basilio, S.A.,* 541 F.2d 307 (2nd Cir.1976), *cert. denied, Compania Maritima San Basilio v. Antypas,* 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977), a Greek seaman was injured on the high seas on a Greek flagged vessel owned by a Panamanian corporation. The Second Circuit found the Jones Act applicable because the stockholders in the Panamanian corporation were U.S. citizens, the shipping line was operated by a firm in New York, all money was received by an agent in New York, and all expenses were paid by the agent in New York. *Id.* at 308–10. "These contacts are substantial and predominate over such factors as the ship's flag, the place of incorporation of the shipowner, and the seaman's nationality." *Id.* at 310. This is significantly more contact with the United States than exists in the instant case.

In *Gonzalez v. Naviera Neptuno,* 832 F.2d 876, 880 (5th Cir.1987), the court noted that "[s]ince determination of the important question of whether American law does or does not apply turns substantially on *Lauritzen–Rhoditis,* the base of operations of the defendant may some-

times be decisive." The court then reversed the district court's conclusion that the base of operations was in the United States because the fact that the company's vessels called often on U.S. ports and carried goods back and forth to the U.S. did not make the U.S. the company's base of operations. *Id.* at 880–81.

Plaintiffs reliance on *Karvelis v. Constellation Lines S.A.,* 806 F.2d 49 (2nd Cir.1986), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987), is inapposite because it was a suit against the operator of the vessel rather than the owner. The Second Circuit held the operator liable as the employer when it had chartered the ship and hired plaintiff to crew it. The operator was a U.S. company. The issue in that case was whether an operator could be liable as an employer, not whether there was sufficient connection with the United States to warrant application of the Jones Act. *Id.* at 50–52.

The Ninth Circuit has consistently weighed all eight of the *Lauritzen/Rhoditis* factors in an attempt to determine which country has the strongest interest in having its law apply to the dispute, giving the greatest weight to the law of the flag, the shipowner's base of operations, and

Ninth Circuit has recognized that the application of these factors is an attempt to gauge each country's interest in having its own law apply. The application of these factors should not be done mechanically, but should reflect an understanding of which country or countries have the strongest interest in having their law apply. *See Rhoditis,* 398 U.S. at 308–09, 90 S.Ct. at 1733–34.

In *Pereira v. Utah Transport, Inc.,* 764 F.2d 686, 688–89 (9th Cir.1985), a Spanish seaman on a Liberian vessel whose base of operations was in the United States was injured in the waters off Thailand. The Ninth Circuit found the most important factors to be the law of the flag and the allegiance of the injured seaman. The Court discounted the importance of the shipowner's base of operations.

> Pereira's "base of operations" argument confronts two significant factors supporting the district court's conclusion that Liberian law applies. First, the law of the flag is the "most venerable and universal rule of maritime law." The [ship] flies the Liberian flag. Second, the contract provided that the law of the flag governs all disputes. These considerations outweigh the fact that [the shipowner] is based in San Francisco, especially in light of the fact that the [ship] rarely called on an American port.

*Id.* at 689–90. The Ninth Circuit affirmed the district court's conclusion that Liberian law applied to the dispute and its dismissal of the suit for forum non conveniens. *Id.*

Similarly, in *Villar v. Crowley Maritime Corporation,* 782 F.2d 1478, 1481–82 (9th Cir. 1986), a Philippine seaman on a Philippine-flagged ship owned by a United States corporation with its base of operations in the United States was injured in Saudi Arabian waters. The court gave the most weight to the law of the flag and the allegiance of the

injured seaman, both of which pointed to the application of Philippine law. *Id.* The Court discounted the importance of the shipowner's base of operations. "The district court did not make a specific factual finding on this point, but even assuming that GTO Corporation's base of operations is in the United States, under these facts that alone is not a sufficient basis to apply the Jones Act." *Id.* at 1482.

In *Rodriguez v. Flota Mercante Grancolombiana, S.A.,* 703 F.2d 1069 (9th Cir.), *cert. denied,* 464 U.S. 820, 104 S.Ct. 84, 78 L.Ed.2d 94 (1983), the court held that United States law should not apply even though: (1) the company earned almost $100,000,000 in income from ships which called on U.S. ports; (2) virtually all of the voyages of the ship on which plaintiff worked had contact with U.S. ports; (3) the shipowner had three representatives in the United States; (4) shipowner had an operating manager in the United States; (5) thirteen of the shipowner's vessels regularly call on U.S. ports; (6) the shipowner's letterhead listed a San Francisco address; (7) the shipowner maintained an office and phone number in San Francisco; (8) the shipowner advertised in U.S. publications; and (9) the sailor was injured while the ship was in the port of San Francisco. *Id.* at 1072–73. Despite all of these connections to the United States, the Ninth Circuit affirmed the dismissal of the Jones Act claim because: (1) the sailor was a Columbian; (2) the ship flew the Columbia flag; and (3) the shipowner's overall base of operations was Columbia. *Id.* Since a Columbian seaman was injured on a Columbian ship, Columbia had the strongest interest in having its law apply.

In *Phillips v. Amoco Trinidad Oil Co.,* 632 F.2d 82 (9th Cir.1980), *cert. denied, Romilly v. Amoco,* 451 U.S. 920, 101 S.Ct. 1999, 68

the citizenship of the seaman. *See Phillips,* 632 F.2d at 86–87; *Pereira,* 764 F.2d at 688–89; *Rodriguez,* 703 F.2d at 1072–73; *Dalla,* 771 F.2d at 1277–79; *Bilyk,* 754 F.2d at 1541. Moreover, the Fifth and Second Circuit cases are distinguishable because they involved commercial shipping operations which transported either goods and/or people to and from the United States. In those cases, the defendant was deriving profits from its operations in the United

States. One of the courts' concerns was that foreign corporations doing business in the U.S. and competing with U.S. corporations not be at a competitive advantage because injuries to their crewmen are subject to foreign damages laws which are less generous than U.S. damages law. In the instant case, the vessel is a private luxury yacht that does not derive any profit from its operations in the United States, nor does it compete with any U.S. companies.

L.Ed.2d 312 (1981), a U.S. flagged vessel owned by a U.S. company was performing drilling operations off the coast of Trinidad. Several Trinidad citizens were injured in an accident there. The vessel was drilling under a license to a U.S. corporation whose principal place of business was in Trinidad. The drilling operation had received a permit and was being monitored by the Trinidad government. *Id.* at 83–84. The Court proceeded to apply the *Lauritzen/Rhoditis* factors and to balance the interests of the United States and Trinidad in adjudicating the lawsuit. The Court noted that the law of the flag, the allegiance of the shipowner and the law of the forum pointed towards the application of U.S. law. *Id.* at 86. Although the law of the flag is usually given great weight because there must be a consistent law of the ship, it was discounted in this case because the drilling rig was stationary off the coast of Trinidad for six years. *Id.* The Court placed much more weight on the place of the wrongful injury, the base of operations of the drilling company, and the citizenship of the injured seamen. These all pointed towards Trinidad. *Id.* at 86–87.

In *Dalla v. Atlas Maritime Co.*, 771 F.2d 1277 (9th Cir.1985), a Syrian seaman was injured in U.S. territorial waters while on a vessel of Greek registry owned by a Liberian corporation. *Id.* at 1277–78. Although the shipowner was a Liberian corporation, its shareholders were U.S. citizens and its base of operations was the United States. These two factors along with the place of injury were sufficient to justify the application of U.S. law to plaintiff's suit. *Id.* at 1278–79.

Finally, in *Bilyk v. Vessel Nair*, 754 F.2d 1541 (9th Cir.1985), the Ninth Circuit affirmed the dismissal of a Jones Act complaint by a U.S. citizen when the vessel flew the Mexican flag, its owners and shareholders were Mexican citizens, Mexico was not an unduly onerous forum, and the written employment contract was entered into in Mexico. Plaintiff was a U.S. citizen living in El Cajon, California who was hired on as a helicopter pilot to fly off the vessel in search of fish. He was injured when he crashed the helicopter into the ocean in international waters. The Court held that the fact that the injured seaman was a U.S. citizen, that the vessel docked in San Diego occasionally for fuel and repairs, and that the vessel owners maintained a bank account in San Diego were insufficient to justify the application of U.S. law. *Id.*

As the *Phillips* court explained, the *Lauritzen/Rhoditis* factors are really an attempt by courts to balance the interests of different countries in having their law apply. *Phillips*, 632 F.2d at 84–86. For instance, when the injury takes place in a country's coastal waters and injures its citizens, that country has a strong interest is providing redress for those injuries. *See Phillips*, 632 F.2d at 82–84; *Villar*, 782 F.2d at 1481. Similarly, many U.S. courts have held that the U.S. has a strong interest in having its law apply when the shipowners are U.S. citizens and have their base of operations in the U.S. *See Dalla*, 771 F.2d 1277; *Antypas*, 541 F.2d 307. Countries have an interest in having their law apply either when their citizens are injured or when their citizens or companies cause injuries to other people. This is based on a country's interests in protecting its citizens and regulating the conduct of its citizens so that they do not injure others.

█ In this case, however, the U.S. has very little interest in having its law apply because neither the injured people nor the owners of the vessel are U.S. citizens. The accident took place in Greek waters, killing two Greek/German citizens and two British citizens. This provides Greece with a strong interest in having its law apply. The owner of the Maridome is a U.K. corporation and three of the injured seamen are British. This gives the U.K. a strong interest in having its law apply. "[T]here is no doubt that 'when the links to the United States are weak and the interests of another sovereign are substantial, the Jones Act is not applicable.'" *Phillips*, 632 F.2d at 86.

All of the cases cited by plaintiffs involve injured *seamen.* When a seaman hires onto a vessel, his nationality takes on lesser importance because he knows that he will be traveling around the world. This is one of the reasons why the flag of the vessel and the vessel owner's base of operations take on so much importance in choice of law. In this

case, three of the dead or injured people were crewmembers of the Maridome, but two were not. Greece has a much stronger interest in having its law apply to its own non-seamen citizens who were killed by a foreign ship while in her waters. These people merely hitched a ride across the harbor on the tender. Further, since the accident took place in Greek waters, many of the witnesses are in Greece, an investigation took place in Greece, and half of the plaintiffs in this case reside in Greece. It would be much more efficient for this suit to proceed in Greece.

Moreover, it is not even clear that the Maridome's base of operations was in the United States. MML terminated Lee and revoked his power of attorney two days prior to the accident off the coast of Greece. Once Lee was terminated, his duties were taken over, in part, by Captain Boos on board the vessel, and in part, by Falb in Mexico City. Thus, at the time of the accident, none of the Maridome's operations were being managed out of the Unites States. Since the date of the accident, the management of the Maridome has taken place exclusively on board the vessel or in Mexico City.

The proper time for applying the *Lauritzen/Rhoditis* factors is the moment when the accident occurs. The question is whether the shipowner was an employer within the meaning of the Jones Act when the accident occurred. In this case, at the moment the accident occurred, the ship's base of operations was either on board the ship or in Mexico. Thus, none of the *Lauritzen/Rhoditis* factors weigh in favor of the application of U.S. law to this dispute, and this case must be dismissed for lack of subject matter jurisdiction.

Even if the Court examines the shipowner's base of operations for the 18 months prior to the accident, the Court cannot make a finding that the Maridome's base of operations was in the United States. The Maridome's operations were managed on three levels. On board the ship, the Captain oversaw the day-to-day operations of the ship, including the crew's performance of their duties, the provisioning of the ship, maintaining proper accounting for ship's expenses, and sailing the ship from one place to anoth-

er. In Virginia, Lee oversaw the operations of the Maridome on a higher level. He interviewed and hired crewmembers, arranged for mail delivery and satellite communications services, prepared and submitted monthly budgets and accounting summaries, dealt with insurance brokers, and arranged for and oversaw repairs. On the highest level, Molina, often through Falb, made the ultimate decisions about how the Maridome was to operate. He purchased the Maridome, he hired Lee and the captains that replaced him, he told Lee to purchase a new Boston Whaler tender, he dictated where the ship would sail, and he provided Lee and Boos with money for the ship's expenses.

It is difficult to choose one base of operations for the Maridome because different management activities were being performed at different locations. Plaintiffs argue that the place where day-to-day operations are managed is the base of operations. *See Phillips*, 632 F.2d at 88. If this is true, then the base of operations is onboard the ship itself Captain Boos managed the day-to-day activities of the crew, provisioning the ship, deciding how to sail where Molina directed, and maintaining daily account ledgers. Lee performed more of the month-to-month activities; overseeing repairs, setting up satellite communications, arranging for major refueling stops, submitting monthly accounting summaries, and hiring new crewmembers. Given that there are no other substantial connections to the United States, the fact that Lee performed a portion of the management of the vessel from the United States is insufficient to justify applying U.S. law.

▪ For these reasons, the Court lacks subject matter jurisdiction over plaintiffs' Jones Act claims. *Lauritzen* was a Jones Act case; however, the Supreme court extended the *Lauritzen/Rhoditis* test to General Maritime Law claims in *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). Although it has not been addressed by the Supreme Court or the Ninth Circuit, other circuits have applied this test to DOHSA claims as well. *DeMateos v. Texaco, Inc.*, 562 F.2d 895, 900 (3rd Cir.1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1449, 55 L.Ed.2d 494 (1978);

*Fitzgerald v. Texaco, Inc.,* 521 F.2d 448, 454 (2nd Cir.1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976).

For these reasons, defendants' motion to dismiss for lack of subject matter jurisdiction is GRANTED. Although the Court lacks subject matter jurisdiction over causes of action brought under the Jones Act, DOHSA or General Maritime law, plaintiffs could still bring causes of action under Greek or U.K. law. For this reason, the dismissal for lack of subject matter jurisdiction would be with leave to amend. Accordingly, the Court next examines whether the entire case should be dismissed for forum non conveniens.

## C. Forum Non Conveniens

### 1. Standard of Law

■■■ If a forum is seriously inconvenient for a party and an alternative forum exists, the court may dismiss the action. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), *reh'g denied, Piper Aircraft Co. v. Reyno,* 455 U.S. 928, 102 S.Ct. 1296, 71 L.Ed.2d 474 (1982).

> [W]hen an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would "establish ... oppressiveness and vexation to a defendant ... out of proportion to plaintiff's convenience," or when the "chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems," the court may, in the exercise of sound discretion, dismiss the case.

*Id.* at 241, 102 S.Ct. at 258. Defendants have the burden to demonstrate the existence of an adequate alternative forum, and that private and public interest factors favor dismissal. The private interest factors which the Court must consider include:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There also may be questions as to the

enforceability of a judgment if one is obtained.

The public interest factors which the Court must consider include:

> the administrative difficulties of a congested court system; the imposition of jury duty on the people of a community that has no relation to the litigation; the local interest in having localized controversies decided at home; and the familiarity of the court with the applicable law.

Further, although the presence of American plaintiffs is not in itself sufficient to bar a court from dismissing the action, the defendant must satisfy "an almost impossible burden" in order to deny a citizen access to the courts of his or her country. Considerably less deference is accorded claims brought by foreign citizens. *Contact Lumber Co. v. P.T. Moges Shipping Co.,* 918 F.2d 1446, 1449 (9th Cir.1990). "This forum non conveniens analysis applies with equal force in the context of admiralty and maritime jurisdiction." *Id.*

### 2. Jurisdiction to Dismiss for Forum Non Conveniens

■■ In admiralty cases, the Court should first make a choice of law determination before embarking on a forum non conveniens analysis. *Zipfel v. Halliburton Co.,* 832 F.2d 1477, 1482 (9th Cir.1987), *cert. denied, Crowley Maritime Corp. v. Zipfel,* 486 U.S. 1054, 108 S.Ct. 2819, 100 L.Ed.2d 921 (1988). In the choice of law analysis, if the Court concludes that the Jones Act applies, then "dismissal for forum non conveniens is precluded." *Id.* at 1486–87. Since the Court has concluded that the Jones Act does not apply, it is not precluded from dismissing the case for forum non conveniens.

### 3. Alternative Fora for this Lawsuit

■■ Before a complaint can be dismissed for forum non conveniens, the defendants have the burden of showing an "adequate and available alternative forum." *Piper,* 454 U.S. at 235, 102 S.Ct. at 252–55. This action had to be instituted in the Southern District of California because it is an in rem action against the vessel, and the vessel was physically seized in this district. The in rem attachment provides plaintiffs with a guaran-

tee that any judgment rendered will be satisfied. Thus, in order for an alternative forum to exist, the in rem attachment must be transferable to that forum, or another bond must be posted in that forum. *Perusahaan Umum Listrik Negara v. M/V Tel Aviv,* 711 F.2d 1231, 1238–39 (5th Cir.1983).

> In admiralty, a vessel ordinarily may be seized in rem on only one occasion, because the seizure releases the vessel from the maritime lien related to the claim. Therefore dismissal of an in rem action may present plaintiff with no alternative forum where jurisdiction is available. Even in those cases where plaintiff can obtain in personam jurisdiction over defendant and an alternative forum thus becomes available, the inability to attach the vessel as security for the enforcement of judgment may render the remedy offered by the alternative forum "no remedy at all" and therefore inadequate.

*Id.* Before the Court can dismiss plaintiffs' complaint for forum non conveniens, the Court must be assured that the alternative forum will accept transfer of the bond or that similar bond has been posted there prior to dismissal of this action.

Defendants argue that both Greece and the United Kingdom are alternative fora which are superior to the United States.

### a) Greece

■ Two days after the accident, on September 5, 1995, several of the plaintiffs in this case filed suit in Greece. The ship was arrested and was required to post a bank guarantee of 62,000,000 drachmas.[7] Once MML posted the bank guarantee, the vessel was released. Defendants subsequently impleaded the Greek government for failure to light or otherwise mark the metal structure. The other plaintiffs in this action joined the Greek action in September of 1996. In October of 1996, plaintiffs arrested the vessel in the United States and began the instant action. The Greek state requested an adjournment of the Greek action in early November

of 1996 because it had not had adequate time to prepare its defense. The Greek court denied this motion. Plaintiffs subsequently withdrew their Greek action on November 5, 1996 without prejudice to their right to reassert such action in the future. Despite the withdrawal of the court action, the 62,000,000 drachma bank guarantee remains posted in favor of the plaintiffs.

Defendants argue that the availability and adequacy of the Greek forum is demonstrated by the fact that plaintiffs initiated a suit there, had a bank guarantee posted, and could have continued to litigate their suit there. Plaintiffs' counsel in the Greek action stated that Greek law provides tort remedies for plaintiffs who have suffered bodily injuries and also provides for damages to be awarded to decedents' families for wrongful death arising from tort. Plaintiffs can recover both their financial loss and moral injury. Moral injury includes damages for grief, sorrow and mental distress that family members have suffered due to the death of one of their relatives.

Defendants also argue that they intend to sue the Greek government for indemnity for failure to light or otherwise mark the metal structure. They cannot implead the Greek government in the United States due to the bar of sovereign immunity. *See* Foreign Services Immunity Act, 28 U.S.C. § 1605 *et seq.* (stating that foreign states are immune from the jurisdiction of U.S. courts). As evidenced by the suit which was filed in Greece, defendants will be able to sue the Greek government in the Greek courts.[8] Defendants contend that the Greek government is a necessary and indispensable party to this action because its negligence in failing to light or otherwise mark the metal structure was the proximate cause of the accident.

■ Plaintiffs respond that the Greek courts are inadequate because most of the plaintiffs cannot proceed on their products liability action against Boston Whaler under Greek law. Apparently, under Greek law, a

---

**7.** The exchange rate is approximately 250 drachmas to one dollar, so this security is equivalent to $248,000.

**8.** There is some dispute over whether a suit against the Greek government can be maintained in Greek Civil Court. Apparently, suit can be maintained against the government, but it must be brought in Greek Administrative Court.

person can only bring a products liability action if the product was being used by the person in his personal, as opposed to professional or occupational, capacity. Plaintiffs argue that because the decedents were "on duty" when the accident occurred, their relatives and estates cannot maintain a products liability action. The evidence, however, is that the crewmembers had the night off duty and were on shore visiting several bars. Thus, they were not "on duty" when the accident occurred. Plaintiffs concede that if they were not "on duty" when the accident occurred, they can maintain a products liability action against Whaler. Moreover, two of the decedents were not crewmembers and were just hitching a ride on the tender. These people were using the product solely in their personal capacities.

■ The unavailability of strict products liability does not make the Greek courts an inadequate forum. In *Piper*, the Supreme Court stated that "[a]lthough the relatives of the decedents may not be able to rely on a strict liability theory, and although their potential damages award may be smaller, there is no danger that they will be deprived of any remedy or treated unfairly." *Piper*, 454 U.S. at 255, 102 S.Ct. at 265. The Supreme Court went on to say that unless the other nation affords a remedy "so clearly inadequate to be no remedy at all," substantial weight cannot be given to this consideration. *Id.* at 254, 102 S.Ct. at 265. In this action, plaintiffs bring both negligence and a strict products liability causes of action against Whaler.

■ Even if the Court were to retain this suit, the choice of law analysis reveals that Greek or U.K. law should apply. The causes of action which may be brought are not dependent on the forum, but on the substantive law that applies. If Greek law were to apply, then plaintiffs could not maintain any cause of action in U.S. courts that they could not maintain in Greek courts. Thus, if Greek law does not allow certain plaintiffs to recover under products liability causes of action, they will be barred regardless of whether the suit proceeds in the U.S. or Greece. More-

over, if Greek law applies, this is a strong factor weighing in favor of a Greek forum. This Court has no knowledge of or experience in applying Greek law, whereas Greek courts are experts in Greek law.

■ Plaintiffs are also concerned about obtaining jurisdiction over Whaler and Captain Boos in Greek court. This concern will be alleviated by conditioning the dismissal of this suit on Boos and Whaler's submitting to jurisdiction in the Greek courts.[9]

■ Plaintiffs' second objection to a Greek forum is that "defendants have demonstrated their lack of respect for the authority of the Greek courts and justice system." Once the 62,000,000 drachma bank guarantee had been lodged, the ship was released and sailed from Greek waters. Later, the Greek court ordered defendants to increase the bond by 60,000,000 drachmas, but defendants' Greek counsel allegedly refused to accept service of the supplemental arrest warrant because the ship was no longer in Greek waters. Plaintiffs argue that this cavalier disregard for the Greek courts is evidence that defendants will not abide by future orders of the Greek courts. This concern will be alleviated by conditioning dismissal of this action on the posting of whatever bond the Greek court deems appropriate. If the Greek court already has MML's money, it would not be possible for MML to ignore a judgment of the Greek court.

■ Plaintiffs' final objection to a Greek forum is that criminal proceedings for negligent homicide are pending against Captain Boos and Chief Engineer Ian MacNeil, the driver of the tender when it crashed. Both apparently fled Greece with the Maridome and have not appeared in Greek court to answer the charges against them. Plaintiffs contend that in order to avoid criminal prosecution, neither of these men will return to Greece. Thus, if this civil case were to go to trial in Greece, these men would only testify via deposition. Since Boos is a party to this action, the Court could condition its dismissal

9. Counsel for both Whaler and Boos stated at oral argument that their clients would agree to this condition.

on his submitting to the jurisdiction of the Greek courts in a similar civil action. In *Gazis v. John S. Latsis (USA) Inc.*, 729 F.Supp. 979, 989 (S.D.N.Y.1990), the Court stated that Greece had a strong interest in "adjudicating the rights of Greek seamen," and noted that "Greece has already demonstrated its interest in this particular case by initiating criminal proceedings against the master, chief officer, and the boatswain of the LADY EMA."

For these reasons, Greece is an adequate alternative forum in which this suit could be prosecuted.

### b) United Kingdom

▉ Defendants also argue that the U.K., like Greece, would be an adequate alternative forum in which this suit could be prosecuted. Plaintiffs do not dispute that British law allows recovery for wrongful death and personal injuries. Rather, plaintiffs contend that U.K. courts lack jurisdiction to adjudicate claims brought by non-U.K. citizens. Two of the five decedents are not U.K. citizens, and the U.K. courts will only entertain their suits if the tortious act was committed in the U.K., if the damages from the tortious act were felt in the U.K., or if the defendant is located in the U.K. Plaintiffs further state that MML is incorporated in the Channel Islands (Jersey) which, although part of the U.K., would not subject MML to the jurisdiction of the U.K. courts. Defendants respond that British courts would not refuse to hear suits against a vessel of British registry which flies the British flag. Further, suit could be brought in the Channel Islands where MML is incorporated.

This potential difficulty could be overcome by the Court's conditioning dismissal of this action on the *acceptance of jurisdiction* over the suits brought by the estates and families of the Greek decedents by the U.K. courts. If the U.K. courts were to decline jurisdiction, then this action could return to this Court.

For this reason, the courts of the United Kingdom are also an adequate alternative forum in which this suit could be prosecuted.

### 4. Public Interests

▉ Public interest factors address the burden the litigation would place upon the Court and members of the public if it were to proceed in the forum chosen by plaintiffs. "Public interest factors encompass court congestion, the local interest in resolving the controversy, and the preference for having a forum apply a law with which it is familiar." *Lockman Foundation v. Evangelical Alliance Mission*, 930 F.2d 764, 771 (9th Cir. 1991).

California and the United States have no interest in resolving this dispute. The accident took place in Greek waters, no U.S. citizens were injured, none of the witnesses on board the tender are U.S. citizens, the vessel flies the British flag, its owner is a U.K. corporation whose shares are held for the benefit of a Mexican citizen, all of the decedents received medical attention in Greek hospitals, and the Greek authorities conducted an investigation into the accident. Defendant Boos is a U.S. resident, but he has not lived in the U.S. in the past twenty years.

The choice of law analysis reveals that Greek or British law would apply to this dispute. This Court has no expertise in foreign law, while Greek and British courts are experts in their own law. The preference for having a forum apply a law with which it is familiar dictates that this suit should be dismissed in favor of proceedings in either Greece or the U.K.

Moreover, Greece has a strong interest in resolving this dispute because two of its citizens were killed in its coastal waters. The United Kingdom also has a strong interest in resolving this dispute because two of its citizens were killed and one was injured, the vessel responsible for their deaths flies the British flag, and the owner of the vessel is a U.K. corporation. Countries have a strong interest in protecting their citizens and in regulating their citizens so that they do not injure others. This demonstrates that the United States has no interest in resolving this dispute, while both the U.K. and Greece have strong interests.

Plaintiffs attempt to minimize these interests by arguing that although three of the

**1378**

injured or killed sailors were British, they lived aboard the vessel full-time, so the U.K. does not have a strong interest in their welfare. Similarly, the Greek decedents were dual citizens of Greece and Germany and resided much of the time in Germany, so plaintiffs contend that Greece does not have a strong interest in their welfare. These arguments are unpersuasive.

The Ninth Circuit has affirmed dismissals for forum non conveniens under similar circumstances. In *Villar v. Crowley Maritime Corp.*, 782 F.2d 1478, 1483 (9th Cir.1986), a Jones Act suit by family members of a Philippine sailor who drowned in Saudi Arabian waters while working on a Philippines-flagged ship owned by Americans was dismissed for forum non conveniens. The Court stated:

> We also agree with the district court's conclusion that the Philippines has a powerful interest in deciding the controversy because of its strong contacts with both the decedent and the [vessel], and that American jurors and court personnel have little interest in this controversy. The district court concluded that the public interest factors point to a Philippine forum.

*Id.* Similarly, in *Sigalas v. Lido Maritime, Inc.*, 776 F.2d 1512 (11th Cir.1985), the court ruled that the Jones Act claim by the wife of a Greek sailor on a Greek-flagged ship owned by a Liberian corporation whose principal place of business was in Greece was properly dismissed for forum non conveniens. The Court stated that plaintiff "represents the archetypal foreign plaintiff bringing her foreign claim to American courts to secure relief more generous than she would get under the law of her homeland." *Id.* at 1520.

Boston Whaler cites the Supreme Court's seminal forum non conveniens decision of *Piper Aircraft v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), in support of its motion to dismiss for forum non conveniens. In *Piper*, a plane owned by a Scottish company crashed in Scotland, killing Scottish and English citizens. The Court explained that the benefits of retaining the action in the U.S. where the manufacturer of the airplane resides were insignificant compared to the enormous burden the foreign dispute would

place on the U.S. court system. *Piper*, 454 U.S. at 260–61, 102 S.Ct. at 268–69. "The American interest in this accident is simply not sufficient to justify the enormous commitment of judicial time and resources that would inevitably be required if the case were to be tried here." *Id.*

Finally, in *Ioannides v. Marika Maritime Corp.*, 928 F.Supp. 374, 380 (S.D.N.Y.1996), the Court stated:

> There is a final public interest consideration that bears more than passing mention. This is a case brought on behalf of a Greek seaman who shipped aboard a Liberian vessel crewed by a Greek company which, wherever its ownership lay, was engaged exclusively in carrying cargos to and from non-u.s. ports. There are fora and remedies available to plaintiffs under the laws of their country of domicile.... There seems little justification for opening the courts of the United States—which are paid for by U.S. taxpayers and whose juries are composed of U.S. citizens asked to drop their everyday activities to serve—to claims in these circumstances, *even if, as plaintiffs stoutly argue, the ultimate base of operations of the vessel in question was the United States.*

*Id.* (emphasis added).

Given the strong interest that Greece and the U.K. have in resolving this dispute and the minimal U.S. interest, the public interest weighs strongly in favor of granting defendants' motion to dismiss for forum non conveniens.

**5. Private Interests**

■ The private interests center on the convenience of the parties and witnesses. The factors to consider include: (1) accessibility of proof; (2) availability of compulsory process for the attendance of unwilling witnesses, and the cost of transporting friendly witnesses; (3) the possibility of viewing the premises; and (4) other practical problems that may make a case, easy, expeditious, and expensive. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947).

First, the proof is more accessible in Greece. The accident took place in Greek coastal waters, the Greek authorities conducted an investigation there, the injured people were treated in Greek hospitals, and many of the plaintiffs reside in Greece. Moreover, the heart of plaintiffs' case is that MacNeil was drinking heavily at a bar in Pireaus, Greece, that he was driving the tender at an excessive speed, and that the tender was overloaded. All of the percipient witnesses to these events are either in Greece, or on board the Maridome. Thus, many of the witnesses and much of the documentary evidence will be found in Greece.

Plaintiffs respond by arguing that they do not need to call many witnesses who are not current crewmembers of the Maridome. Plaintiffs plan to call Peter Lee, a resident of Virginia, who is in poor health, and might not be willing or able to travel to Greece for the trial. Plaintiffs also state that they can retain a doctor in the U.S. to testify to damages. The one surviving sailor's treating doctor resides in England and is willing to fly to the U.S. to testify. Finally, plaintiffs argue that they intend to call Whaler employees to testify regarding their products liability claims. These witnesses would all be U.S. residents.

While plaintiffs may not intend to call Greek witnesses, it does not mean that defendants will not need to call many Greek witnesses. Moreover, defendants intend to seek indemnity from the Greek government, and this is only available in Greece. Since the Court is conditioning dismissal on Whaler's submission to Greek jurisdiction, it could be required to produce its employees to testify at trial in Greece, or at least to produce them to testify by deposition.

The next factor to consider is the possibility of viewing the premises. The premises are located in Port of Poros, Greece. Plaintiffs point out that the metal structure has since been removed by the Greek government, so there would not be much to view at the site. Photographs were taken of the structure and they could be introduced at trial no matter where trial is held.

There are several other practical considerations to take into account. First, plaintiffs are worried about the enforceability of a Greek judgment. Plaintiffs point out that MML refused to post the additional security required by the Greek court and that MacNeil and Boos have not submitted to criminal prosecution there. Since the Court is conditioning dismissal of this suit on MML's posting whatever security the Greek court requires, this money could then be used to satisfy any judgment. Plaintiffs are upset because the amount of bond that will be required by Greek courts will probably not be as large as the $15,000,000 bond that this Court required. *See Sigalas,* 776 F.2d 1512 (noting that the fact that relief under U.S. law would be more generous does not make the foreign forum inadequate).

■ Second, plaintiffs are concerned about the potential language barrier in the Greek courts. With the exception of the families of the Greek decedents, none of the other plaintiffs or defendants speak Greek. Plaintiffs contend that obtaining translators will increase the length and cost of the Greek trial. In *Neo Sack, Ltd. v. Vinmar Impex, Inc.,* 810 F.Supp. 829, 836 (S.D.Tex.1993), the court noted the fact that many of the underlying documents were in Gujrati, Hindi or other Indian languages as one of the reasons for dismissing the case for forum non conveniens. In this case, we already have English translations of some affidavits of Greek witnesses. It is apparent that no matter where the case is tried, there are both English speaking and Greek speaking witnesses. All of the crewmembers of the Maridome speak English, but the documents regarding the Greek authorities' investigation of the incident and the medical treatment of the injured sailors in Greek hospitals would be in Greek. If the case were to proceed in Greece, plaintiffs would retain Greek counsel to speak on their behalf.

■ Third, plaintiffs argue that since a portion of this action is an in rem action against the ship, it can only be brought where the ship is found. Plaintiffs cite *Cliffs–Neddrill Turnkey International–Oranjestad v. M/T Rich Duke,* in which the court stated "[b]ecause an in rem action may only be brought in one district, that district,

in most cases, should be deemed convenient." 734 F.Supp. 142, 145–46 (D.Del.1990). This is true in most cases because the asset seized is usually real property or some other immobile object. It is most convenient to bring the suit in the district where the property is located because it cannot be moved. Ships, by their very nature, are extremely mobile. There are multiple districts where an in rem action could be brought against the ship, depending on the current location of the vessel. In this case, in fact, the vessel was previously arrested in Greece and a bank guarantee was lodged before the ship was released. This demonstrates that a similar action can be brought in Greece and negates any perceived efficiency or convenience from having the in rem suit proceed in the United States.

Finally, defendants argue that the fact that they would be barred from impleading the Greek government for indemnity in the U.S. is a factor that weighs in favor of dismissing this case for forum non conveniens. Although defendants would have to bring a separate action in the Administrative Courts of Greece, those courts give deference to findings in the Greek Civil courts. For this reason, if the Greek civil courts were to reach a final judgment in this action and found that the Greek government had been negligent, defendants could proceed against the government in the Administrative Courts for indemnity. The findings of the Civil Court would be entitled to deference in the Administrative Court. There is no assurance that such a finding by a United States District Court would be accorded any deference by the Greek Administrative Court.

Both Greece and the U.K. are adequate alternative fora, and the balance of private and public interests weighs strongly in favor of dismissing this action for forum non conveniens. For these reasons, the Court GRANTS defendants' motion to dismiss for forum non conveniens.

## IV. Conclusion

The Court has in rem jurisdiction over the Maridome by virtue of the Supplemental Rule B attachment of the vessel. Also due to this attachment, the Court has quasi in rem jurisdiction over MML to the extent of the value of the vessel. The Court has personal jurisdiction over defendant Boos because he was personally served while in the district. Although MML has sufficient contacts with the United States to support the exercise of personal jurisdiction over it, the Court lacks personal jurisdiction over it because its contacts with Virginia are sufficient to subject it to personal jurisdiction in Virginia. See Fed. R.Civ.P. 4(k)(2). For these reasons, defendant Boos' motion to dismiss for lack of personal jurisdiction is DENIED, and defendant MML's motion to dismiss for lack of personal jurisdiction is GRANTED.

The second issue is whether the Court has subject matter jurisdiction over plaintiffs' claims under the Jones Act, DOHSA and the General Maritime Law. Based on the application of the *Lauritzen/Rhoditis* factors, the Court concludes that United States law should not apply; rather, Greek or U.K. law should apply. Defendants' motion to dismiss for lack of subject matter jurisdiction is GRANTED with leave to amend.

Since application of the *Lauritzen/Rhoditis* factors determines whether the Court has subject matter jurisdiction over plaintiffs' claims, not whether a claim can be stated upon which relief can be granted, defendants' motion to dismiss pursuant to Rule 12(b)(6) is DENIED. This motion is also moot since the Court is granting defendants' motion to dismiss for lack of subject matter jurisdiction.

Finally, the Court GRANTS defendants' motion to dismiss for forum non conveniens. Both Greece and the United Kingdom are adequate alternative fora, and the private arid public interest factors weigh strongly in favor of dismissing this action in favor of an action in one of those fora. This dismissal is conditioned on: (1) all of the defendants making a general appearance in the foreign forum chosen by plaintiffs; (2) MML posting whatever security for the vessel the foreign court requires, and (3) the foreign court's acceptance of jurisdiction over this case. Once these conditions are all met, the $15,-

000,000 bond held by this Court will be released, and this action will be dismissed.

IT IS SO ORDERED.