United States Court of Appeals,

Eleventh Circuit.

Nos. 94-3370, 95-2108.

James F. ALDERMAN, Plaintiff-Appellant,

v.

PACIFIC NORTHERN VICTOR, INC., Marco Alaska Northern Victor, Inc., John Johannassen Victor, Inc., Lloyd Johannassen Victor, Inc., d/b/a Northern Victor Partnership, Defendants-Appellees,

Southern Tuna Corporation, a Washington Corporation, Defendant.

James F. ALDERMAN, Plaintiff-Appellant,

v.

PACIFIC NORTHERN VICTOR, INC., Marco Alaska Northern Victor, Inc., John Johannassen Victor, Inc., Lloyd Johannassen Victor, Inc., d/b/a Northern Victor Partnership, Southern Tuna Corporation, a Washington Corporation, Defendants-Appellees.

Sept. 23, 1996.

Appeals from the United States District Court for the Northern District of Florida. (No. 93-50149 RV), Roger Vinson, Judge.

Before TJOFLAT, Chief Judge, BLACK, Circuit Judge, and REAVLEY[*], Senior Circuit Judge.

REAVLEY, Senior Circuit Judge:

In February of 1990 the M/V Northern Victor, owned by the Northern Victor Partnership, was docked in navigable waters in southern Florida where it was undergoing a conversion from an oil drilling vessel to a fish processing vessel. Alderman, a carpenter, was assisting in the installation of an elevator aboard the Northern Victor. On the 5th of February, Alderman fell when he slipped in oil which had leaked from a codfish heading machine. Years later, Alderman filed the instant suit in state court. The

[*]Honorable Thomas M. Reavley, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

cause was removed to federal court based upon the diversity of the parties and upon admiralty jurisdiction. The district court granted summary judgment in favor of the defendants, and Alderman appeals.

Relying upon *Sisson v. Ruby,* 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990), and our former circuit's opinion in *Kelly v. Smith,* 485 F.2d 520, 525 (5th Cir.1973), the district court determined that this was a maritime tort.[1] The district court granted summary judgment for Northern Victor, holding that the suit was time barred because it had not been filed within the applicable three-year statute of limitations.[2] Subsequent to that decision, the Supreme Court handed down its opinion in *Grubart v. Great Lakes Dredge & Dock Co.,* --- U.S. ----, ----, 115 S.Ct. 1043, 1047, 130 L.Ed.2d 1024 (1995), which specifically rejected the four-factor test in *Kelly,* 485 F.2d at 525.

The issue before us is a simple one. If the tort is governed by maritime law, the parties agree that the statute of limitations has run. If, however, it is governed by Florida law, the suit continues. Finding this to be a maritime tort, we affirm.

Discussion

Whether substantive admiralty law applies is a question of law that we review de novo.[3] To determine whether substantive admiralty law applies, we decide whether this suit comes within the

---

[1] *See Sea Vessel, Inc. v. Reyes,* 23 F.3d 345, 350 n. 9 (11th Cir.1994) ("We continue to recognize the *Kelly* test as a permissive, as opposed to mandatory, tool.")

[2] 46 U.S.C.App. § 763a.

[3] *Sea Vessel,* 23 F.3d at 347.

admiralty jurisdiction of the district court.[4]

A federal court's authority to hear cases in admiralty flows initially from the Constitution, which "extend[s]" federal judicial power "to all Cases of admiralty and maritime Jurisdiction."[5] Traditionally, the test for admiralty tort jurisdiction was simple; jurisdiction existed if the tort occurred on navigable waters.[6] As technology advanced, it became apparent that this test was no longer sufficient. In a trilogy of cases between 1972 and 1990, the Supreme Court redefined the test for admiralty cases.[7]

Today, for a tort claim to be cognizable under admiralty jurisdiction, the activity from which the claim arises must satisfy a location test and it must have sufficient connection with maritime activity.[8] "A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water."[9] In this case both parties readily agree that this tort

---

[4]*See East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 862-66, 106 S.Ct. 2295, 2298-99, 90 L.Ed.2d 865 (1986); *Mink v. Genmar Industries, Inc.,* 29 F.3d 1543, 1547 (11th Cir.1994).

[5]U.S. Const., Art. III, § 2; *Grubart v. Great Lakes Dredge & Dock Co.,* --- U.S. ----, ----, 115 S.Ct. 1043, 1047, 130 L.Ed.2d 1024 (1995).

[6]*Id.,* at ----, 115 S.Ct. at 1047; *The Plymouth,* 3 Wall 20, 34, 18 L.Ed. 125 (1865).

[7]*Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972); *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982); *Sisson v. Ruby,* 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990).

[8]*Grubart,* --- U.S. at ----, 115 S.Ct. at 1048.

[9]*Id.*

occurred on navigable waters.

The connection test raises two issues. First, we are required to " "assess the general features of the type of accident involved,' to determine whether the incident has "a potentially disruptive impact on maritime commerce.' " [10] Second, we "must determine whether "the general character' of the "activity giving rise to the incident' shows a "substantial relationship to traditional maritime activity.' " [11] Alderman argues that the connection test is not met.

### A.

The first issue we confront is the potentially disruptive impact upon maritime commerce. Alderman asserts that, as a matter of fact, there was no disruptive impact on maritime commerce as a result of his injury. He argues that the defendants "have not demonstrated any disruption, other than the unsupported representation that "the overall aspect of the venture, including the Plaintiffs, shipyards, and vessel owners commercial interests, have been affected by the incident.' "

Alderman's reliance on the actual impact of the incident upon maritime commerce is misplaced. "The first *Sisson* test turns, then, on a description of the incident at an intermediate level of possible generality." [12] We must look to "whether the incident could

---

[10]*Id.* (*quoting Sisson,* 497 U.S. at 362-64 & n. 2, 110 S.Ct. at 2896 & n. 2).

[11]*Grubart,* --- U.S. at ----, 115 S.Ct. at 1048 (quoting *Sisson,* 497 U.S. at 362-64 & n. 2, 110 S.Ct. at 2897, 2896 & n. 2).

[12]*Grubart,* --- U.S. at ----, 115 S.Ct. at 1051.

be seen within a class of incidents that posed more than a fanciful risk to commercial shipping."[13] The correct inquiry is not whether there was an effect on maritime activity, but rather whether there "potentially" could have been.[14] This distinction is crucial. When examining the disruptive impact on maritime activity for purposes of determining jurisdiction, our focus is not on what *actually* happened, but upon the *potential* effects of what could happen.

In this case, we examine the nature of injuries that resulted during the conversion of an oil drilling vessel to a fish processing vessel. The general features of this accident may be described as an onboard injury which occurred during the repair, maintenance or conversion of a vessel. Any accident occurring in this manner could have the potential to disrupt further repairs of that vessel, vessels being worked on at the same dock, or vessels waiting to be worked upon. Not only could it inhibit the maritime commerce of the vessel under repair, but it could easily disrupt other vessels. Unsafe working conditions aboard a vessel under repairs, maintenance, or conversion, therefore, pose a potentially disruptive impact upon maritime commerce.[15] Whether or not

---

[13]*Id.*

[14]*Grubart,* --- U.S. at ----, 115 S.Ct. at 1051; *Sisson,* 497 U.S. at 362-64, 110 S.Ct. at 2896 ("The jurisdictional inquiry does not turn on the *actual* effects on maritime commerce of the fire on Sisson's vessel; nor does it turn on the particular facts of the incident in this case....").

[15]*See Coats v. Penrod Drilling Corp.,* 61 F.3d 1113, 1119 (5th Cir.1995) (en banc) ("Without a doubt, worker injuries, particularly to those involved in repair and maintenance, can have a disruptive impact on maritime commerce by stalling or delaying the primary activity of the vessel."); *White v. United States,* 53 F.3d 43, 47 (4th Cir.1995) (Person injured while disembarking a ship docked during repairs "poses a more than

disruption resulted here is of no moment.

B.

Next, Alderman asserts that the activity underlying this suit does not have a substantial relationship to maritime activity. In support of his proposition, Alderman relies heavily upon our opinion in *Penton v. Pompano Const. Co., Inc.,* 976 F.2d 636 (11th Cir.1992). In *Penton* we were also examining whether a plaintiff's negligence claim constituted a maritime tort. Penton operated a construction crane mounted on a barge. The crane off loaded rocks from other supply barges and placed the rocks to create a 150-foot-long jetty. Upon completion of the jetty, Penton was responsible for the removal of the crane onto land. During this disassembly, Penton was injured.

The court in *Penton* characterized the activity causing Penton's injury as a "typical construction site accident."[16] The court determined that the unloading of the crane onto land could not be compared to the unloading of cargo from a vessel. The crane was not "cargo" in any sense of the word. Additionally, the court found it important that the crane was being used in the construction of the 150-foot-long jetty. Essentially, the barge was being used as a platform for the crane to perform "water-side construction" of the jetty. The court also found it important that Penton was a "construction worker by training and experience."[17]

---

fanciful risk to a variety of activities essential to maritime commerce.")

[16]976 F.2d at 641.

[17]*Id.*

We believe *Penton* is not controlling.  Alderman asserts that he too was merely a "construction worker" and that the accident suffered aboard the ship was no different than any other "typical construction site accident" that could occur on land.  The work of the injured plaintiff does not determine whether there is a substantial relationship to maritime activity.  The important question is "whether a  *tortfeasor's* activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the case at hand."[18]  Therefore, we are to look not at Alderman's activities, but instead, the activities of the tortfeasor.  This was further emphasized in *Grubart* when the Court noted that where there are multiple tortfeasors "as long as one of the putative tortfeasors was engaged in traditional maritime activity the allegedly wrongful activity will "involve' such traditional maritime activity and will meet the second nexus prong."[19]  To the extent that the opinion in *Penton* relied upon the plaintiff's activities, that case has been overruled by *Grubart.*

Our examination of the actions of the tortfeasor should be given a "broad perspective."[20]  The "cases have made clear that the relevant "activity' is defined not by the particular circumstances of the incident, but by the general conduct from which the incident

---

[18]*Grubart,* --- U.S. at ----, 115 S.Ct. at 1051 (emphasis added).

[19]*Id.* at ----, 115 S.Ct. at 1052.

[20]*Sisson,* 497 U.S. at 366-67, 110 S.Ct. at 2898.

arose."[21]  The Northern Victor's activity was substantially related to traditional maritime activity.  The vessel was undergoing a conversion from an oil drilling vessel to a fish processing vessel. Under the broad perspective given the second test, we believe that conversions, repairs, or maintenance aboard a vessel in navigable water are substantially related to traditional maritime activity.[22] Work upon ships at sea or docked in navigable waterways is an indispensable maritime activity.  It is essential to the continued productive use of those vessels.

Conclusion

Having determined that both tests are met, this case came within the admiralty jurisdiction of the district court.  "With admiralty jurisdiction comes the application of substantive admiralty law."[23]  Therefore, this is a maritime tort, and the cause of action is time barred under the applicable three year statute of limitations.[24]

AFFIRMED.

---

[21]*Sisson,* 497 U.S. at 364-66, 110 S.Ct. at 2897.

[22]*Coats,* 61 F.3d at 1119 ("the repair and maintenance of a jack-up drilling rig on navigable waters is certainly a traditional maritime activity.");  *see Grubart,* --- U.S. at ----, 115 S.Ct. at 1051 ("On like reasoning, the "activity giving rise to the incident" in this case, should be characterized as repair or maintenance work on a navigable waterway performed from a vessel.  Described this way, there is no question that the activity is substantially related to traditional maritime activity...."  (citation omitted)).

[23]*East River Steamship,* 476 U.S. at 862-66, 106 S.Ct. at 2298-99;  *Mink,* 29 F.3d at 1547.

[24]46 U.S.C.App. § 763a.