**TIM SEVISON and TRICIA McNULTY, Plaintiffs**

**v.**

**CRUISE SHIP TOURS, INC., and OUT ISLAND CHARTERS, LTD., Defendants**

Civ. No. 1996-57

District Court of the Virgin Islands

Div. of St. Thomas and St. John

August 15, 1997

231

234

Karin A. Bentz, Esq., St. Thomas, U.S.V.I., and Steven C. Dittman Esq., (Gainsburgh, Benjamin, David, Meunier, Noriea & Warshauer), New Orleans, LA, *for Plaintiffs*

J. Daryl Dodson, Esq., (Moore & Dodson), St. Thomas, U.S.V.I., and Carol Hurst, Esq., (Dudley, Topper & Feuerzeig), St. Thomas, U.S.V.I., *for Defendants*

MOORE, *Chief Judge*

## MEMORANDUM

This matter is before the court on two separate motions to dismiss. The first, filed by both defendants, Cruise Ship Tours, Inc. ["CST"] and Out Island Charters, Ltd. ["Out Island"] is based upon the doctrine of forum non conveniens. Out Island has filed an

235

additional motion to dismiss based upon lack of personal jurisdiction. For the following reasons, the motion to dismiss both defendants on forum non conveniens grounds is denied, and the motion to dismiss Out Island for lack of personal jurisdiction is granted.

## I. Factual and Procedural Background

This case arises out of a personal injury suffered by Tim Sevison ["Sevison"] on board a sailboat, the Golden Eagle, while it was docked at a boatyard in St. Kitts on May 27, 1994. The Golden Eagle, a 76-foot catamaran, is owned by CST, a United States corporation with its principal place of business located in St. Thomas, who had contracted with the St. Kitts boatyard to build the boat. At the time of the accident, the Golden Eagle was floating on navigable, territorial waters of St. Kitts in the boatyard while final preparations and construction were completed before the Golden Eagle's maiden voyage. Sevison was on board the Golden Eagle as a guest of the person overseeing the completion of the boat. He and his wife were apparently vacationing on St. Kitts and hoping to catch a ride to St. Maarten aboard the Golden Eagle on its maiden voyage. Sevison alleges that he fell through an open hatch and injured his groin area, that this accident was caused by the negligence of the defendants, and that he is entitled to damages. His wife, Tricia McNulty, is also suing for damages on a derivative claim for loss of consortium.

When CST entered into the construction contract with the boatyard several years before this incident, CST contemplated operating the Golden Eagle for daysails for tourists out of St. Thomas. Because construction of the boat was delayed several years, however, CST changed its plans sometime before the accident and decided that the Golden Eagle would be used for daysails out of St. Maarten. Despite these change of plans, at the time of the incident the boatyard had placed all of the previously shipped emblems on the boat which identified the Golden Eagle's home port as St. Thomas. These emblems were removed at a later date. While the boat was originally constructed to meet United States Coast Guard specifications, the Golden Eagle has never been submitted to the Coast Guard for inspection and approval. In May

236

of 1994 the Golden Eagle was insured for navigation "within (200) miles from St. Thomas, USVI." The boat was registered in St. Thomas on July 6, 1994.

After it was completed, the Golden Eagle was operated by Out Island, a Dutch corporation with its principal place of business located in St. Maarten, pursuant to a charter agreement which was executed with CST on June 7, 1994. The agreement stated that the charter was to begin on June 1, 1994, provided the boat was delivered to St. Maarten. Both the commencement and execution of the charter agreement and Out Island's possession and operation of the Golden Eagle occurred after Mr. Sevison's unfortunate accident. It was Out Island that sailed the vessel from St. Kitts to St. Maarten. The only time that the Golden Eagle has been in St. Thomas was within the first month of its use, and, of course, after the accident, for repairs to the mast and for installation of a generator. During this time in St. Thomas, one of the principals of CST spent a day sailing on the Golden Eagle with friends and family.

Plaintiffs filed their complaint on April 3, 1996. A second amended complaint was filed on January 3, 1997. After defendants jointly filed their motion to dismiss on forum non conveniens grounds, a hearing was held on April 24, 1997, at which time all parties were given the opportunity to file supplemental briefs. Out Island filed its motion to dismiss for lack of personal jurisdiction in compliance with Rule 56.1 of the Local Rules of Civil Procedure on June 10, 1997. The briefing complete, this memorandum and order dispose of all pending motions.

## II. Discussion

### A. Motion to Dismiss for Forum Non Conveniens

■■■ The principle of forum non conveniens permits the court to decline otherwise proper jurisdiction over an action where the convenience of the parties and witnesses, or the administrative constraints on the court, would be better served by allowing the action to proceed in a different available forum. *Jennings v. Boeing Co.*, 660 F. Supp. 796, 800 (E.D.Pa. 1987)(*citing Dahl v. United Technologies Corp.*, 632 F.2d 1027, 1029 (3d Cir. 1980)). In deciding whether dismissal is proper, the court must first determine that an

appropriate alternative forum exists. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n. 22, 70 L. Ed. 2d 419, 102 S. Ct. 252 (1981). If an alternative forum exists, the court weighs numerous public and private factors in deciding whether to dismiss the case as set forth by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-509, 91 L. Ed. 1055, 67 S. Ct. 839 (1947).

The important private interest considerations include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; (4) the possibility of viewing the premises, if viewing would be appropriate to the action; and (5) all other practical problems that make trial of a case easy, expeditious and inexpensive. *Id.* at 508. The public interest considerations include: (6) administrative difficulties resulting from court congestion; (7) imposing jury duty on people of a community which has no relation to the litigation; (8) the local interest in having controversies decided at home; and (9) the avoidance of unnecessary problems in the application of foreign law. *Id.* at 508-09.

■ A plaintiff's choice of forum must not be disturbed unless the balance of the private and public interest factors strongly favors the defendant. *See Gilbert*, 330 U.S. at 508. Moreover, when the plaintiff is an American citizen and the alternative forum is foreign, the burden upon the defendant to show that the plaintiff's choice is inconvenient is even stronger. *See Warn v. M/Y Maridome*, 961 F. Supp. 1357, 1374 (S.D.Cal. 1997)("although the presence of American plaintiffs is not in itself sufficient to bar a court from dismissing the action, the defendant must satisfy 'an almost impossible burden' in order to deny a citizen access to the courts of his or her country.")

> A plaintiff should not be deprived of her home jurisdiction 'except upon a clear showing of facts which either (1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems.'

238

*Massaquoi v. Virgin Atlantic Airways*, 945 F. Supp. 58, 61 (S.D.N.Y. 1996)(*quoting Koster v. Lumbermens Mutual Casualty Co.*, 330 U.S. 518, 524, 67 S. Ct. 828, 831-32, 91 L. Ed. 1067 (1947)).

■ Defendants have met the threshold requirement of showing that an adequate, alternative forum exists, namely St. Kitts. Defendants attach an affidavit to their motion from a legal practitioner familiar with the laws of St. Kitts who stated that the type of negligence claims asserted by plaintiffs "are, as a general matter, causes of action that the courts of our Country recognize and for which, in appropriate cases, they provide a remedy." (Seaton Aff., at ¶ 2.) In addition, the affidavit states that it is most likely that both defendants would be amenable to service of process in that jurisdiction. Plaintiffs do not contest the accuracy or reliability of this affidavit. This is sufficient for this Court to find that St. Kitts would be an adequate alternative forum.

1. Private Interest Factors

The private interest factors dealing with the convenience of witnesses, factors (2) and (3), weigh slightly in favor of conducting the trial in St. Kitts. The defendants argue that many of the witnesses would be found in St. Kitts. These potential witnesses are the workers on the boat who might have observed the accident and who are from St. Kitts. In addition, the owner of the boatyard responsible for building the boat is from St. Kitts. Bringing such witnesses to St. Thomas would be costly. For those witnesses that are not from St. Kitts, (such as the plaintiffs, one of the overseers of the boat construction, any expert witnesses and the treating doctors), travelling to St. Thomas for a trial is arguably as inconvenient as travelling to St. Kitts. St. Thomas is only convenient from a geographical standpoint for the CST's principal who resides here, but who is willing to travel to St. Kitts for any necessary trial.

■ The defendants further argue that not only would it be inconvenient and costly for the Kittian witnesses to testify in St. Thomas, but that this Court would not have the power to compel their attendance at trial or at a deposition if such witnesses proved unwilling to voluntarily testify, while a court in St. Kitts would

239

have such power. Plaintiffs assert that St. Kitts is a signatory of an international treaty which authorizes a United States court to compel testimony, a fact which defendants dispute. Even if defendants are correct and unwilling Kittian witnesses could not be compelled to testify, such a factor standing alone would not require dismissal on forum non conveniens grounds. Courts have recognized that there are other methods of obtaining evidence from international sources absent the subpoena power, such as letters rogatory, and thus have refused to dismiss a case based upon that factor alone. *See, e.g. Massaquoi*, 945 F. Supp. at 62.

The other private interest factors, (4) and (5), i.e. ease of access to proof, viewing of the premises, and all other practical problems, weigh more strongly in favor of maintaining the litigation in this jurisdiction, or are at best neutral. If a viewing of the Golden Eagle would prove necessary, the boat could as easily be sailed to St. Kitts or St. Thomas from its home base of St. Maarten. Even though St. Kitts and St. Thomas are both Caribbean islands geographically far removed from the plaintiffs' residence of California, St. Kitts would in fact be more inconvenient for the plaintiffs because St. Kitts is a foreign jurisdiction while St. Thomas is under the flag of the United States. Litigating in St. Kitts would require the retention of local attorneys familiar with the St. Kitts legal system. This Court follows for the most part the same procedural rules as all other United States district courts, and plaintiffs' stateside lawyers have been admitted here pro hac vice. Not only are the procedural rules of this court generally familiar to plaintiffs' chosen counsel, but plaintiffs argue that United States federal general maritime law would be the substantive law to be applied to this case. For plaintiffs' counsel, litigating the case before this Court would thus be more practical and expeditious than trying to litigate in St. Kitts. Defendants argue that St. Kitts would be more convenient because St. Kitts law is the applicable law. Whether United States general maritime law or St. Kitts' law applies is thus relevant both to the private interest factor of making the litigation of this case practical for the parties, and the public interest factor (9) of avoiding unnecessary problems in the application of foreign law. This choice of law issue is discussed below.

## 2. Public Interest Factors

■ The four public interest factors in the forum non conveniens analysis, including the choice of law factor, are mainly concerned with preventing a court and its local juries from having to expend limited resources to resolve a dispute in which the forum has little or no interest. In most cases where the action is dismissed on forum non conveniens grounds, the litigation has few if any connections to the forum, i.e. one or both of the parties are not from the forum, the relevant events did not take place in the forum, and the forum's law would not govern the case. *See, e.g. Camejo v. Ocean Drilling & Exploration*, 838 F.2d 1374 (5th Cir. 1988)(widow of Brazilian seaman suing Brazilian and U.S. defendants for diving accident in conjunction with Brazilian mineral exploration enterprise in Brazilian waters); *Jennings*, 660 F. Supp. 796 (Irish plaintiff suing Pennsylvania manufacturer for helicopter crash in the North Sea). In many instances, both the plaintiff and defendant are in fact foreign citizens. *See, e.g., Warn*, 961 F. Supp. 1357 (non-U.S. plaintiffs suing British shipowners for accident in Greek waters); *Evans v. Cunard Line Limited*, 1994 U.S. Dist. Lexis 5029, 1994 A.M.C. 1948 (S.D.N.Y. 1994)(British citizen suing British cruise ship for injury on high seas between Britain and New York).

■ Similarly, in choice-of-law analysis, a court weighs the relevant interests of each state to the particular issue in determining whose law should be applied. *See, e.g.*, RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (Choice of law principles)(1971). In federal maritime law, special choice of law rules are applicable. In maritime cases with foreign connections brought in United States courts, courts look at what connection the United States has to the dispute in determining whether American maritime law is applicable. If there is little United States interest, i.e. the plaintiff is foreign, the ship is foreign, the relevant incident occurred outside of United States waters, etc., the court will not apply United States maritime law and dismiss the case for failure to state a claim. *See, e.g., Lauritzen v. Larsen*, 345 U.S. 571, 97 L. Ed. 1254, 73 S. Ct. 921 (1953); *Villar v. Crowley Maritime Corp.*, 782 F.2d 1478, 1481-82 (9th Cir. 1986)(Phillipine seaman on Phillipine flagged ship injured in Saudi Arabian waters).

Indicative of the similarity in factors relevant to both choice of

241

United States maritime law and forum non conveniens analyses is the fact that some courts have held that if United States maritime law is found to be applicable, the case cannot be dismissed on forum non conveniens grounds. *Zipfel v. Halliburton Co.*, 832 F.2d 1477, 1482 (9th Cir. 1987)(if Jones Act applies, dismissal on forum non conveniens precluded); *Warn*, 961 F. Supp. at 1374 (same); *see also* 2 THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 21-11 at 517 (2d ed. 1994)[hereinafter "SCHOENBAUM"]("A . . . prerequisite to applying *forum non conveniens* is a determination whether American or foreign law governs the claim. . . . If American law is found to apply, the court ordinarily retains jurisdiction."); *but see Camejo*, 838 F.2d at 1378-79 (noting that choice of law only tangentially related to forum non conveniens analysis and expressly disapproving of retaining jurisdiction simply if American maritime law can be applied).

a. Nature of claim — maritime connection test

█ The first question to be resolved is whether this case presents a maritime claim. In deciding whether the case is maritime, the Court looks at the tests applied by United States courts when determining whether admiralty jurisdiction is present. If the tort is maritime, then the federal maritime choice of law rules are applicable. This analysis necessarily touches upon the significance of United States contacts and United States interest in resolving the dispute. Defendants argue that this is a simple tort and the fact that the tort took place on a boat while it was docked in a boatyard is insufficient to justify the application of maritime law. In addition, because defendants characterize the claim as a simple tort, defendants argue that the relevant choice of law rules favor application of the law of the place of the injury, namely St. Kitts. This Court finds that this case does require application of maritime law, and, that under maritime choice of law rules, application of United States general maritime law is appropriate. Because the private interest factors weigh only slightly in favor of the defendants, and because United States law is applicable, defendants have failed to meet their heavy burden of justifying dismissal of this case from this United States jurisdiction in favor of a foreign jurisdiction.

 The federal maritime law consists of both statutory and judge-made law. Maritime law governing personal injuries can be

found both in statute and general maritime law. For example the Jones Act, 46 U.S.C. § 688, covers injuries to seamen. Moreover, non-statutory general maritime law specifically recognizes a claim for personal injury to a non-seaman, such as Sevison, aboard a vessel due to negligence. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 3 L. Ed. 2d 550, 79 S. Ct. 406 (1959). Plaintiffs are asserting maritime negligence claims, which differ from common law negligence claims in that the standard of care does not vary based upon the status of injured person, e.g. invitee versus licensee, *id*. at 631-32, and in that the doctrine of comparative negligence is followed, i.e. the contributory negligence of the plaintiff is not a total bar to his claim but simply may result in some mitigation of damages. *Id*. at 629. As maritime tort claimants, of course, the plaintiffs must still prove the essential elements of a negligence claim, including (1) existence of a duty, (2) breach of that duty, (3) proximate cause and (4) damages. 1 SCHOENBAUM § 3.5 at 157.

Maritime law applies to a tort if the incident occurs on a vessel on navigable waters, bears a substantial relationship to traditional maritime activity and has a potential impact on maritime commerce. *Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531-34, 130 L. Ed. 2d 1024, 115 S. Ct. 1043 (1995); *Sisson v. Ruby*, 497 U.S. 358, 364-67, 111 L. Ed. 2d 292, 110 S. Ct. 2892 (1990); *see generally*, SCHOENBAUM, § 3.5 at 78. As noted below, this Court finds that this incident satisfies these requirements, which necessitates the application of maritime law.[1]

---

[1] If the claim is a maritime claim, then the plaintiff may sue in federal court under the federal court's admiralty jurisdiction. The plaintiff is also free to pursue his maritime claim under the court's civil jurisdiction if another basis for federal jurisdiction, i.e. diversity jurisdiction, is available. *See, e.g., Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1054-55 (9th Cir. 1997). Whether a plaintiff brings his claim under the court's "admiralty" side versus the court's "civil" side has important procedural ramifications, the most important being that there are no jury trials before a court sitting in admiralty. Even when a plaintiff chooses to invoke the court's civil jurisdiction rather than its admiralty jurisdiction, the substantive law of the applicable maritime law still governs his claim. Accordingly, in this case, the plaintiffs have chosen to invoke the court's civil jurisdiction based upon the diverse citizenship of the parties and the requisite amount in controversy. Because his claim is maritime, however, the general maritime law governs it, assuming United States law is applicable.

### i. *Golden Eagle is a vessel*

█ In this case it appears that the Golden Eagle was a vessel on navigable waters. Defendants emphasize that it was in a boatyard undergoing the final stages of construction and had not yet made its maiden voyage. The common definition of the term "vessel" set out by Congress is "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation by water." 1 SCHOENBAUM § 3.6, at 88-89 (citing 1 U.S.C. § 3). It is undisputed that at the time of the accident the Golden Eagle was floating, and thus presumably was "capable" of being used for transportation by water. This capability was confirmed when the boat was operated under sail only a short time after the incident.[2] Defendants also do not dispute that the water where the Golden Eagle was kept was "navigable," but point out that it was within the territorial waters of St. Kitts, and not within the territorial waters of the United States or the high seas.

### ii. *Golden Eagle was on navigable waters*

█ The term "navigable waters" is not anywhere expressly limited to the navigable territorial waters of the United States and the high seas. Indeed, American maritime law has been applied in the territorial waters of foreign states. *Cf. Neely v. Club Med Management Services, Inc.,* 63 F.3d 166 (3d Cir. 1995)(U.S. maritime law applicable to tort occurring in the coastal waters of St. Lucia); *Jennings,* 660 F. Supp. at 803 (extending United States statutory maritime law, the Death on the High Seas Act, to the territorial waters of foreign nations). The fact that the navigable waters at issue here are not within the territorial waters of the United States but are foreign territorial waters is only relevant to the determina-

---

[2] Defendants attach an affidavit from Judy Reeve, the Secretary and Treasurer of CST, who states that "when the incident occurred on May 27, 1994, the vessel had not yet set sail and to the best of my knowledge was incapable of navigating, as it had not yet been fully rigged." Aff. at ¶ 4. It is undisputed that the boat was near completion, and although perhaps not capable of operating under sail, there is no evidence that it was not capable of navigating via a motor on board. For purposes of this motion, the court accordingly finds that the Golden Eagle was a vessel under general maritime law. *See, e.g. Offshore Express Inc. v. Bergeron Boats, Inc.,* 1978 AMC 1504 (E.D.La. 1977)(a floating hull was enough of a completed ship to be a vessel whether based on tort or contract in a possessory suit); *see generally* MARTIN J. NORRIS, THE LAW OF MARITIME PERSONAL INJURIES § 1.8 (4th ed. 1990)(vessels include a houseboat without motive power and a large dredging barge without motive power capable of being towed).

244

tion of whether U.S. maritime law should be applied, not whether the tort is a maritime tort.[3]

Having determined that the tort occurred on a vessel in navigable waters, this Court must next "assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce," and then "determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart*, 513 U.S. at 534 (quotation marks and internal citations omitted). As the Supreme Court in *Grubart* acknowledged, "although . . . [not] every tort involving a vessel on navigable waters falls within the scope of admiralty jurisdiction . . . ordinarily that will be so." *Id.* at 543. *See also* SCHOENBAUM § 3.6 at 88 ("Acts that occur aboard a vessel will be presumed, absent unusual circumstances, to meet the maritime relationship requirement.")

### iii. Maritime nexus–potential for disruption

For the first step in the maritime nexus inquiry, whether the incident has a potential for disruption of maritime commerce, courts look at the characteristics surrounding the incident "at an intermediate level of possible generality." *Grubart*, 513 U.S. at 538. In *Sisson*, the incident involved the fire on a pleasure boat docked at a marina when no other commercial vessels were nearby. The

---

[3] In support of the proposition that United States maritime law does not apply in the territorial waters of St. Kitts, defendants cite a district court case which summarily dismissed a plaintiff's admiralty claim for wrongful seizure because the alleged tort took place outside the navigable waters of the United States in British Colombia. *Sharma v. Skaarup Ship Management Corp.*, 699 F. Supp. 440, 448 (S.D.N.Y. 1988). The court's only support for this holding was a quote from *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 205, 30 L. Ed. 2d 383, 92 S. Ct. 418 (1971) that "the historic view of this Court has been that the maritime tort jurisdiction of the federal courts is determined by the locality of the accident and that maritime law governs only those torts occurring on the navigable waters of the United States." When making this statement, however, the Supreme Court was discussing whether Alabama state law or federal maritime law governed an injury of a worker on a pier driving a forklift with cargo destined for a ship on the dock. The Court was merely reiterating the traditional "location" test used to determine whether a tort was maritime or not, i.e. if the tort occurred on water, federal maritime law applied, and if it occurred on an extension of land, state non-maritime tort law applied. This test has since been modified by the Supreme Court to location plus a nexus to maritime activity. *See, Sisson v. Ruby*, 497 U.S. 358, 364-67, 111 L. Ed. 2d 292, 110 S. Ct. 2892 (1990).

Court described the incident as "a fire on a vessel docked at a marina on navigable waters," and concluded that this type of incident clearly had the potential of disrupting commerce, because the fire could have spread to nearby commercial vessels or made the marina inaccessible to such vessels. Sisson, 497 U.S. at 362-63. The fact that no commercial vessels were nearby was irrelevant in *Sisson*. The inquiry focuses on the *potential* for disruption, and not on whether the incident *in fact* caused any disruption of maritime commerce. The incident involved here, described at an intermediate level of generality, is an accident on board a vessel docked on navigable waters of a boatyard while undergoing the final stages of construction.

■ Other courts have held that accidents on board boats while docked in navigable waters at boatyards undergoing repairs possessed the potential to disrupt maritime commerce. *See, e.g. Alderman v. Pacific Northern Victor, Inc.*, 95 F.3d 1061 (11th Cir. 1996); *White v. United States*, 53 F.3d 43, 47 (4th Cir. 1995)(Person injured while disembarking a ship docked during repairs "poses a more than fanciful risk to a variety of activities essential to maritime commerce.") In *Alderman* plaintiff was injured during the installation of an elevator while the ship was docked in navigable waters of Southern Florida during the conversion of the boat from an oil drilling vessel to a fish processing vessel. The court described the general features of the accident as "an onboard injury which occurred during the repair, maintenance or conversion of a vessel." 95 F.3d at 1064. The court found that "any accident occurring in this manner could have the potential to disrupt further repairs of that vessel, vessels being worked on at the same dock, or vessels waiting to be worked upon" and thus the accident met the potential disruption prong. *Id*. Similarly, in this case, Sevison's accident during the final construction of a boat meets the first step of the maritime nexus inquiry in that such an accident could potentially disrupt maritime commerce.

*iv. Maritime nexus—traditional maritime activity*

■ The second step involves the general character of the activity that gave rise to the claim and whether such activity has a substantial relationship to traditional maritime activity. In *Grubart*,

246

the activity giving rise to the accident was described as repair or maintenance work on a navigable waterway performed from a vessel. 513 U.S. at 540. In this case, the activity giving rise to the incident was the final construction and preparations for sailing performed on the vessel on navigable waters. This activity, much like that in *Grubart*, is substantially related to traditional maritime activity. *See also, Alderman*, 95 F.3d at 1065 (conversions, repairs or maintenance aboard a vessel in navigable water are substantially related to traditional maritime activity). Accordingly, plaintiffs' claims fit the definition of a maritime claim under United States law.

b. Maritime choice of law rules

 Whether United States law is applicable to this maritime claim depends upon a nonexhaustive number of factors set out by the Supreme Court in *Lauritzen v. Larsen*, 345 U.S. 571, 97 L. Ed. 1254, 73 S. Ct. 921 (1953) and *Hellenic Lines, Ltd. v. Rhoditis*, 398 U.S. 306, 309, 26 L. Ed. 2d 252, 90 S. Ct. 1731 (1970). In *Lauritzen*, the Court had to determine whether United States statutory maritime law, specifically the Jones Act, was applicable to an injury suffered by a Danish seaman aboard a Danish ship in Cuban waters. In determining what law should be applied among the several foreign states with connections to the incident, the Court looked to (1) the place of the wrongful act, (2) the law of the flag, (3) allegiance or domicile of the injured, (4) allegiance of the defendant shipowner, (5) the place of contract, (6) the inaccessibility of a foreign forum, and (7) the law of the forum. *Lauritzen*, 345 U.S. at 583-93, 97 L. Ed. 1254, 73 S. Ct. 921. The Court in Rhoditis added an eighth factor to be weighed: (8) the shipowner's base of operations. 398 U.S. at 309. This choice of law analysis is also applicable to general maritime law claims. *Romero v. International Terminal Operating, Co.*, 358 U.S. 354, 382, 3 L. Ed. 2d 368, 79 S. Ct. 468 (1959).

Not all of the factors are given equal weight, and their importance may vary with the circumstances of the individual case. Generally, however, the most important factors are (3) the allegiance or domicile of the injured person, (4) the allegiance of the defendant shipowner or operator, (6) whether a foreign forum is

available, and (8) the defendant shipowner's base of operations. 1 SCHOENBAUM § 6-13 at 281. These factors "correctly emphasize the interests and contacts of the parties and the national interests of the respective countries involved." *Id*. The remaining four factors namely (2) the law of the flag, (1) the place of injury, (5) the place of any employment contract and (7) the law of the forum are of lesser importance because they are often fortuitous. *Id*. at 282.

The United States Court of Appeals for the Third Circuit has interpreted the choice-of-law approach taken by the Supreme Court as a "substantial contacts" test. *Neely v. Club Med Management, Services, Inc.*, 63 F.3d 166, 182 (3d Cir. 1995). The court noted that the Lauritzen test is "a specialized form of interest analysis designed to ensure that American maritime law of personal injuries applies only where significant American interests are implicated and only in conformity with international law." *Id*. The court accordingly held that under the Lauritzen analysis a plaintiff must demonstrate, as a threshold requirement, a basis for prescriptive jurisdiction. *Id*. at 186. Prescriptive jurisdiction is a term taken from international law which means the authority of a state "to make its law applicable to the activities, relations, or status of persons, or the interests of persons in things . . . ." *Id*. at 184-85 (*quoting* § 401(a) of the RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW (1987)).

There is prescriptive jurisdiction to apply American maritime law if one or more of the following is present: (a) injury to an American seaman or a seaman with American dependents, (b) injury in American territory, (c) American defendants, (d) an American flagged ship, or (e) a contractual choice-of-law clause specifying American law. *Id*. at 186. Once a basis for prescriptive jurisdiction is found, courts then analyze all of the *Lauritzen/ Rhoditis* factors in light of the second goal of *Lauritzen*, which is to ensure that the application of American law is reasonable. *Id*. (relying on § 403(1) of the RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW which specifies that even if prescriptive jurisdiction is present, states should refrain from exercise of that jurisdiction when it would be unreasonable.) The basic purpose of this exercise is to avoid conflicts with the law of another foreign state who also has an interest in the dispute.

■ Once prescriptive jurisdiction is established, application of American law is reasonable when it does not conflict with a foreign law. An actual conflict arises only when the American law and the foreign law are different. As the *Neely* court explained,

> where the substance of foreign law is unknown, the Lauritzen inquiry could at most be used prophylactically, to steer clear of potential but unknown conflicts. Because holding American law inapplicable at this point would do so without a textual mandate—and with significant American interests present—such judicially imposed restraint should not be de rigueur. A court typically should not hold that the United States' exercise of prescriptive jurisdiction is unreasonable in a case where the substance of relevant foreign law is unknown, unless it concludes that the basis for prescriptive jurisdiction is exceedingly weak and that virtually all other contacts likely implicate policies of the foreign nation.
>
> Moreover, the plaintiff generally has no responsibility to demonstrate the content of potentially applicable foreign law. . . .

*Id*. at 189.

In *Neely*, prescriptive jurisdiction was present because the injured plaintiff was an American. Plaintiff was a dive instructor working for a Club Med and was injured by a dive boat owned by a St. Lucia corporation while in the coastal waters of St. Lucia. The defendants provided evidence of the existence of foreign contacts but "no information concerning what potentially applicable St. Lucian law might provide."*Id*. Thus the court was unable to "calibrate the extent of foreign interests at stake' and concluded that American law would apply 'unless virtually all of the Lauritzen factors point away from the United States.' *Id*. at 190. Because the factors did not all point away from United States, American maritime law was applicable.

In Sevison's case, there are two bases for prescriptive jurisdiction. The allegiance and domicile of both the injured plaintiff and the defendant shipowner is the United States. Thus application of American law is reasonable, absent a conflict with potentially

applicable St. Kitts law. As in *Neely*, the defendants have pointed to the St. Kitts' contacts in this case, but do not provide any information on the substantive nature of that law. Accordingly, unless all of the *Lauritzen* factors weigh heavily in favor of applying St. Kitts law, American law is applicable to this case. Most of the more important *Lauritzen* factors in fact weigh in favor of application of United States law, including the domicile of the injured plaintiff and the domicile of one of the defendants. In addition, while the Golden Eagle's base of operations and its flag are currently St. Maarten, at the time of the accident, the boat had not yet been chartered and it is unknown whether an American flag was on board. At least when it was first being built, the boat was contemplated for use in the U.S. Virgin Islands. Moreover, defendant CST is based in St. Thomas, its principal officer and shareholder, John Reeve, lives in St. Thomas, and the boat was registered in St. Thomas shortly after the accident.

Other circumstances of this case support the application of American law. The Golden Eagle was always contemplated to be used as a day sail charter for tourists coming off of cruise ships, although the place of operation was changed from St. Thomas to St. Maarten. The majority of these tourists are in fact American. John Reeve testified that about 90% of the passengers aboard the Golden Eagle now are American. *See Neely*, 63 F.3d at 194 ("defendants' continual and quite substantial ·commercial invitation of American tourists to [the Club Med resort in St. Lucia] implicates interests of the United States that support application of American law to this case.") In addition, the Golden Eagle was originally designed to meet United States Coast Guard specifications, although it was never formally submitted for inspection and approval.

■ Upon weighing all the factors and the circumstances of this incident, the Court finds that the American interest in ensuring that work performed on boats being built for American shipowners to American standards for use by American tourists is conducted in a safe and non-negligent manner sufficiently outweighs any interest that St. Kitts may have with regard to this incident. *Cf. Neely*, 63 F.3d at 195 ("The United States has a great interest in assuring adequate protection for the life and health of Americans

who are solicited in the United States to vacation or work at Club Med or other foreign spots . . . .") Accordingly, United States general maritime law is applicable, and dismissal on forum non conveniens grounds is inappropriate.

## B. *Motion to Dismiss Out Island for Lack of Personal Jurisdiction*

As noted above, this dispute arises out of an injury that occurred on the Golden Eagle before it was chartered to defendant Out Island and while it was still under the final stages of construction in St Kitts. Out Island is a Dutch corporation organized and existing under the laws of St. Maarten, whose sole business is to operate day sail charters from St. Maarten. Out Island's only contacts with the Virgin Islands are: (1) the Golden Eagle was sailed to St. Thomas for some repairs, and (2) the shareholders of Out Island are residents of St. Thomas. Out Islands' contacts with the United States in general are through the vacation business it solicited on cruise lines, most of whom are American tourists.

Plaintiffs argue that personal jurisdiction is proper under the Virgin Islands Long Arm Statute. 5 V.I.C. § 4903 (1967 & Supp. 1997). This Court finds that there is no basis for exercising personal jurisdiction under the local Virgin Islands Long Arm Statute. Plaintiffs contend, alternatively, that even if Out Island cannot be reached through the Long Arm Statute, this Court may exercise personal jurisdiction pursuant to RULE 4(k)(2) of the FEDERAL RULES OF CIVIL PROCEDURE. Plaintiffs assert such jurisdiction is consistent with the Constitution and laws of the United States, their claims arise under federal law, and Out Island (assuming it is not subject to personal jurisdiction in the Virgin Islands) is not subject to jurisdiction of the courts of general jurisdiction of any state. *See* FED. R. CIV. P. 4(k)(2). This Court further holds that exercise of personal jurisdiction over Out Island is not available under RULE 4(k)(2) because it would offend the constitutional notion of due process.

The Virgin Islands Long Arm Statute provides:

(a) A court may exercise personal jurisdiction over a person, who acts directly or by an agent, *as to a claim for relief arising from the person's*

251

(1) transacting any business in this territory;

(2) contracting to supply services or things in this territory;

(3) causing tortious injury in this territory by an act or omission outside this territory if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this territory;

. . .

(5) having an interest in, using, or possessing real property in this territory; or

(6) contracting to insure any person, property, or risk located within this territory at the time of contracting;

. . .

(b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.

5 V.I.C. § 4903 (emphasis added). The plaintiffs have failed to demonstrate how any of these bases for jurisdiction are applicable to Out Island. Even if Out Island has conducted business or contracted to supply services or things in this Territory, which Out Island disputes, these acts have nothing to do with any of plaintiffs' claims for relief. In other words, plaintiffs' claims do not "arise from" any acts of Out Island that would arguably fit within one of the subsections of the Long Arm Statute. On the contrary, plaintiffs' claims arise from the final preparation and construction of the Golden Eagle in St. Kitts before it was chartered to Out Island.

Personal jurisdiction is also not available under the method provided for in the FEDERAL RULES OF CIVIL PROCEDURE. RULE 4(k)(2) provides:

If the exercise of jurisdiction is consistent with the Constitution and the laws of the United States, serving a summons or filing a waiver of service is also effective,

with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

This rule was added to the FEDERAL RULES OF CIVIL PROCEDURE in 1993 to correct

> a gap in the enforcement of federal law that was created by the former rule when the defendant was a nonresident of the United States having contact with United States sufficient to justify the application of United States law and to satisfy federal standard of forum selection but having insufficient contact with any single state to support jurisdiction under state long-arm statutes or to meet the requirement of the Fourteenth Amendment limitation on state court territorial jurisdiction. . . . Restriction on the exercise of territorial jurisdiction by federal courts over persons outside the United States are still subject to the Fifth Amendment limitations on state-court jurisdiction with respect to affiliating contacts and the due process requirements of fair play and substantial justice.

4A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1124 (2d ed. 1987, Supp. 1997); *see also Western Equities, Ltd. v. Hanseatic, Ltd.*, 35 V.I. 460, 956 F. Supp. 1232, 1234 (D.V.I. 1997).

 In order for jurisdiction under RULE 4(k)(2) to be applicable, the defendant (1) must not be subject to the personal jurisdiction of any state or territory, (2) the claims must arise under federal law and (3) the exercise of jurisdiction must comply with the constraints imposed by the Due Process Clause of the Fifth Amendment. The first two requirements are easily met. As discussed above, Out Island's contacts with the Virgin Islands are insufficient for it to be subject to personal jurisdiction under the Virgin Islands' long arm statute and the record reveals no other substantial contacts sufficient for exercise of jurisdiction by any other state or territory. While defendants contend that this case is a simple tort case, and federal maritime law is inapplicable, the Court dis-

agrees.[4] It is well-settled that federal admiralty and maritime claims are claims that "arise under federal law" for purposes of RULE 4(k)(2). *Hanseatic*, 956 F. Supp. at 1235, n. 4 and cases cited therein. The Court finds, however, that the exercise of jurisdiction in this instance would violate the Due Process Clause of the Fifth Amendment.

■ To determine whether the exercise of personal jurisdiction over Out Island is constitutionally permitted, the Court applies the familiar minimum contacts test articulated by the Supreme Court in *International Shoe Company v. State of Washington*, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1946) and its progeny. In analyzing minimum contacts for personal jurisdiction under RULE 4(k)(2), the contacts the courts deem relevant are whether the defendant (1) transacts business in the United Statesm, (2) does an act in the United States, or (3) does an act outside the United States which has an effect in the United States. *Hanseatic*, 956 F. Supp. at 1237. It is not enough, however, that a defendant's contact with the United States fit within one of the above descriptions. The plaintiffs' claims further must "arise out of" such relevant minimum contacts in order for exercise of personal jurisdiction to be constitutional. In minimum contacts analysis, only when a defendant's contacts are of a systematic and continuous nature may he be sued for any claim, even ones unrelated to those contacts. *See, e.g. Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 80 L. Ed. 2d 404, 104 S. Ct. 1868, nn. 8, 9 (explaining distinction between jurisdiction over a specific claim and general jurisdiction over any claim). Accordingly, simply because Out Island may indeed have some minimum contacts with the United States, if plaintiffs' claims do not arise from those contacts, exercise of personal jurisdiction is unconstitutional.

Plaintiffs expend much energy listing the number of contacts of Out Island with St. Thomas and with the United States as a whole. Among many examples, plaintiffs note that Out Island "chartered a vessel registered and owned by a Virgin Islands entity," that it "pays a fee to a U.S. Virgin Island corporation, directly into a

---

[4] *See* forum non conveniens discussion in part II(A) *supra*.

254

United States Virgin Islands' bank account in St. Thomas," and that the "terms of the charter party require the captain for the Golden Eagle be subject to the owner's approval." (Opp. Mot. Dismiss, at 7-8). Plaintiffs note that the Golden Eagle was repaired in the Virgin Islands. Plaintiffs also emphasize that Out Island advertises on United States cruise lines and, as a result, most of its business is derived from American tourists. None of these contacts with the United States or St. Thomas have anything to do with plaintiff's alleged injury on board the Golden Eagle. Plaintiff's cause of action simply does not arise out of Out Island's conduct of business in the United States, nor does it arise out of any act committed by Out Island in the United States. Moreover this lawsuit has nothing to do with any act committed by Out Island outside of the United States that had an effect within the United States. Finally, the listed contacts taken as a whole do not represent sufficiently systematic or continuous contacts with the United States to justify Out Island being haled into a United States court on any claim especially one unrelated to its very limted contacts with the United States. Accordingly, Out Island's motion to dismiss for lack of jurisdiction is granted. An appropriate order is attached.

ENTERED this 15th day of August, 1997.

## ORDER

For the reasons set forth in the accompanying memorandum, it is hereby

ORDERED that the motion to dismiss for forum non conveniens filed by the defendants, Cruise Ship Tours, Inc. and Out Island Charters, Ltd. is DENIED; and it is further

ORDERED that the motion to dismiss defendant Out Island Charters, Ltd is GRANTED.

ENTERED this 15th day of August, 1997.